IGNACIA S. MORENO, Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division
THOMAS K. SNODGRASS, Trial Attorney
United States Department of Justice
Environment & Natural Resources Division
Natural Resources Section
999 18th Street
South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1368
Fax: (303) 844-1350
thomas.snodgrass@usdoj.gov

CARLIE CHRISTENSEN, United States Attorney (#0633)
DANIEL D. PRICE, Assistant United States Attorney (#2646)
185 South State Street, Suite 300
Salt Lake City, UT  84111
Tel: (801) 524-5682

ATTORNEYS FOR THE UNITED STATES

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| STATE OF UTAH and EMERY COUNTY,<br><br>                        Plaintiffs,<br><br>vs.<br><br>UNITED STATES OF AMERICA, DEPARTMENT OF THE INTERIOR, BUREAU OF LAND MANAGEMENT,<br><br>                       Defendants. | Civil No. 2:05CV00540 DB<br><br>**MEMORANDUM IN SUPPORT OF UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Honorable Dee V. Benson |

**TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

LEGAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.      Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.     Revised Statute 2477. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.    Subject Matter Jurisdiction and Sovereign Immunity  . . . . . . . . . . . . . . . . . . . . . . . 5

        A.      Case or Controversy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        B.      The Doctrine of Sovereign Immunity  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

IV.     Quiet Title Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

STATEMENT OF MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I.      Mexican Mountain Road . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        A.      General Description of Mexican Mountain Road  . . . . . . . . . . . . . . . . . . . . . 7

        B.      Basis of Alleged Case or Controversy and Disputed Title Interest . . . . . . . . . . . 8

        C.      1975 Application for Permit to Drill Submitted by Wainoco, Inc. . . . . . . . . . . . 9

        D.      1980 Memorandum of Understanding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        E.      Designation of Mexican Mountain Wilderness Study Area in 1980 . . . . . . . . . 14

        F.      1984 Trespass Citation for Improvements Completed by Emery County
                on the East Mexican Mountain Road . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        G.      1991 San Rafael Resource Management Plan . . . . . . . . . . . . . . . . . . . . . . . . 17

II.     Sid's Leap Road . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        A.      General Description of Sid's Leap Road . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

i

B. 1961 East Johnny's Fork Range Improvement Project . . . . . . . . . . . . . . . . . . . . 18

C. Sid's Leap Road and the 1980 MOU . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

D. Sid's Leap Road and the Mexican Mountain WSA . . . . . . . . . . . . . . . . . . . . . 20

E. Sid's Leap Road and the 1991 Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

III. Copper Globe Road . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

A. General Description of Copper Globe Road . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

B. 1963 Recreation Inventory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

C. 1971 Memorandum of Understanding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

D. Copper Globe Road and the 1980 MOU . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

E. The State's Grant of an Exclusive Easement to the United States for
the Portion of the Copper Globe Road Located Over State Lands . . . . . . . . . . 23

F. BLM's Maintenance and Improvement of the Copper Globe Road . . . . . . . . . 24

IV. Seeger's Hole Road . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

A. General Description of Seeger's Hole Road . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

B. Seeger's Hole Road and the 1971 MOU . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

C. BLM's Grading of the Seeger's Hole Road . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

I. This Court Lacks Subject Matter Jurisdiction Over the Claim to the West
Mexican Mountain Road Because There is No Case or Controversy to
Adjudicate and No Disputed Interest in Title for Purposes of the QTA . . . . . . . . . . . . 27

A. Lack of Case or Controversy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

B. Lack of Disputed Title to Real Property Under the QTA . . . . . . . . . . . . . . . . . 28

II.  Plaintiffs' Claims are Barred by the QTA's Statute of Limitations as to the East Mexican Mountain, Sid's Leap, Copper Globe, and Seeger's Hole Roads. . . . . . . . . . 29

　A.  Construction of QTA's Statute of Limitations  . . . . . . . . . . . . . . . . . . . . . . . . . 29

　　1.  The Courts Construe the QTA's Statute of Limitations Narrowly and in Favor of the United States  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

　　2.  The Courts Use a Reasonableness Test in Determining When a County Plaintiff "Knew or Should Have Known" of the United States' Claim  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

　　3.  For State Claims, the QTA's Statute of Limitations is Triggered as of "the Date the State Received Notice of the Federal Claims to the Lands," Subject to Certain Additional Requirements  . . . . . . . . . . . 31

　B.  East Mexican Mountain Road. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

　　1.  The United States Triggered the Statute of Limitations in 1975 as to the East Mexican Mountain Road by Exercising Exclusive Jurisdiction and Control Over the Road and Overseeing its Construction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

　　2.  The BLM Again Triggered the Statute of Limitations as to the County's Claim for the East Mexican Mountain Road Through the 1980 MOU.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

　　3.  The BLM Again Triggered the Statute of Limitations Through its Designation of the Mexican Mountain Wilderness Study Area in 1980 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

　　4.  The BLM Again Triggered the Statute of Limitations By Issuing a Trespass Citation to the County in 1984 for Unauthorized Improvements on the East Mexican Mountain Road and Subsequently Requiring Reclamation of the Improvements and Closure of the Road  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

　　5.  The BLM Again Triggered the Statue of Limitations Through its Issuance of the 1989 FEIS and 1991 Plan  . . . . . . . . . . . . . . . . . . . . . . 39

　C.  Sid's Leap Road . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

1. The BLM Triggered the Statute of Limitations By Constructing Approximately the First Mile of the Sid's Leap Road in 1961 as a Range Improvement Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

2. The BLM Triggered the Statute of Limitations in 1980 Through the Designation of the Mexican Mountain WSA . . . . . . . . . . . . . . . . . . . 42

3. The BLM Triggered the Statute of Limitations By Issuing the 1989 FEIS, Approving the 1991 Plan, and Subsequently Managing the Sid's Leap Road to Implement the Plan's Closure of its East End . . . . . 43

D. Plaintiffs' Claim to the Copper Globe Road is Barred by the Statute of Limitations by Virtue of the 1971 and 1980 MOUs, the State's Grant of an Exclusive Easement to the BLM for a Portion of the Road in 1985, and Subsequent Road Work Completed by the BLM . . . . . . . . . . . . . . . . . . . . . . . . 44

E. Plaintiffs' Claim to the Seeger's Hole Road is Barred by the Statute of Limitations by Virtue of the 1971 MOU and Subsequent Road Grading Performed by the BLM on a Recurring Basis on the Upper Seeger's Hole Road . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

III. The State's Claims to the East Mexican Mountain, Sid's Leap, Copper Globe, and Seeger's Hole Road are Barred Because the State did not Acquire a Purported Interest in these Rights-of-Way Under Utah's Legislative Scheme Until After the County's Claims Were Barred by the Statute of Limitations . . . . . . . . . . . . . . . . . . . . . . 48

A. Under Utah's Legislative Scheme, the State's Purported Interest in these Rights-of-Way is Derivative of and Subject to the Same Limitations as the County's . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

1. The Utah Legislature's 1993 Statutory Enactments Were Insufficient to Create an Ownership Interest in the State . . . . . . . . . . . . . . . . . . . . . . . 49

2. The Utah Legislature's 2000 Statutory Enactments Were Likewise Insufficient to Create an Ownership Interest in the State . . . . . . . . . . . 50

IV. The State's Claims as to the East Mexican Mountain Road, Sid's Leap Road, Copper Globe Road, and Seeger's Hole Road Are Barred by Utah Code Ann. § 78B-2-201. . . 51

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

iv

# TABLE OF AUTHORITIES

## CASES

Alaska v. United States, 201 F.3d 1154 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Allen v. Wright, 468 U.S. 737 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Amoco Prod. Co. v. United States, 619 F.2d 1383 (10th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . 30

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Aragon v. United States, 146 F.3d 819 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Block v. North Dakota, 461 U.S. 273 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 30, 31, 42

Calhoun County, Texas v. United States, 132 F.3d 1100 (5th Cir. 1998) . . . . . . . . . . . . . . . . . 32

California ex. rel., State Land Comm'n v. Yuba Goldfields, Inc., 752 F.2d 393
(9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 46

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

Central Pac. Ry. Co. v. Alameda County, 284 U.S. 463 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . 4

Christiansen v. Utah-Idaho Sugar Co., 590 P.2d 1251 (Utah 1979) . . . . . . . . . . . . . . . . . . . . . 51

Consejo de Desarrollo Economico de Mexicali, A.C. v. United States, 482 F.3d 1157
(9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

County of Inyo v. U.S. Dep't of Interior, Case No. CV F-06-1502 AWI DLB,
2008 WL 4468747 (E.D. Cal. Sept. 29, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38, 43

Dep't of the Army v. Blue Fox, Inc., 525 U.S. 255 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Fidelity Exploration and Prod. Co. v. United States, 506 F.3d 1182 (9th Cir. 2007) . . . . . . . . 30

Friends of Sierra R.R., Inc. v. I.C.C., 881 F.2d 663 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . 38

Garcia v. Bd. of Educ. of Albuquerque Pub. Schs., 520 F.3d 1116 (10th Cir. 2008) . . . . . . . . . 5

General Atomic Co. v. United Nuclear Corp., 655 F.2d 968 (9th Cir. 1981) . . . . . . . . . . . . . . . 6

Harrell v. United States, 443 F.3d 1231 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Hawaii v. United States, 676 F. Supp. 1024 (D. Hawaii 1988) . . . . . . . . . . . . . . . . . . . . . . . . . 31

Humboldt County v. United States, 684 F.2d 1276 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . 6, 30

Knapp v. United States, 636 F.2d 279 (10th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 36

Leisnoi, Inc. v. United States, 170 F.3d 1188 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . 6, 7, 28

McCarthy v. United States, 850 F.2d 558 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

McFarland v. Norton, 425 F.3d 724 (9th Cir. 2005), cert. denied, 129 S. Ct. 1582 (2009) . . . . 31

Michel v. United States, 65 F.3d 130 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 38

Millard County v. United States, No. 93-C-591J (D. Utah Dec. 4, 1995) (Memorandum
Decision) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Nevada v. United States, 731 F.2d 633 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 41

North Dakota ex rel. Bd. of Univ. v. Block, 789 F.2d 1308 (8th Cir. 1986) . . . . . . . . . . . . . . . 31

Park County, Mont. v. United States, 626 F.2d 718 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . 30

Pelt v. Utah, 539 F.2d 1271 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Russell Packard Development, Inc. v. Carson, 78 P.3d 616 (Utah Ct. App. 2003) . . . . . . . . . . 51

S. Utah Wilderness Alliance v. BLM, 425 F.3d 735 (10th Cir. 2005) . . . . . . . . . . . . . . . . 4, 5, 27

Shultz v. Dep't of Army, 886 F.2d 1157 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Southwest Four Wheel Drive Ass'n v. BLM, 271 F. Supp. 2d 1308 (D.N.M. 2003) . . . 36, 37, 43

Thomas v. McCombe, 99 F.3d 352 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Trail Mountain Coal Co. v. Utah Div. of State Lands and Forestry,
921 P.2d 1365 (Utah 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

vi

United States ex rel. Grynberg v. Praxair, Inc., 389 F.3d 1038 (10th Cir. 2004) . . . . . . . . . . . . 5

Unified School Dist. No. 259 v. Disability Rights Ctr., 491 F.3d 1143 (10th Cir. 2007) . . . . . . . 5

United States v. Beggerly, 524 U.S. 38 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

United States v. Diebold, Inc., 369 U.S. 654 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

United States v. Mitchell, 445 U.S. 535 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

United States v. Mottaz, 476 U.S. 834 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 30

United States v. Nordic Village, Inc., 503 U.S. 30 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

United States v. Testan, 424 U.S. 392 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Vincent Murphy Chevrolet Co., Inc. v. United States, 766 F.2d 449 (10th Cir. 1985) . . . . . 30, 31

Warren v. Provo City Corp., 838 P.2d 1125 (Utah 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Washington County v. United States, 903 F. Supp. 40 (D. Utah 1995) . . . . . . . . . . . . . . . . 27, 28

Wisconsin Valley Improvement Co. v. United States, 569 F.3d 331 (7th Cir. 2009) . . . . . . . . 30


STATUTES


28 U.S.C. § 2409a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

43 U.S.C. § 932 (repealed 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 13

Pub. L. No. 94-579, 90 Stat. 2743 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 12

Pub. L. No. 99-598, 100 Stat. 3351 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Utah Code Ann. § 27-12-26 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Utah Code Ann. § 72-3-105 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49, 50

Utah Code Ann. § 72-3-107 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Utah Code Ann. § 72-5-103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49, 50

Utah Code Ann. § 72-5-302 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49

Utah Code Ann. § 78B-2-201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 51, 52

## RULES

Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

## REGULATIONS

43 C.F.R. § 2811.0-5 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

43 C.F.R. §§ 2811.0-3 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

44 Fed. Reg. 58,106 (Oct. 9, 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

45 Fed. Reg. 75,602 (Nov. 14, 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

54 Fed. Reg. 36,059 (Aug. 31, 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## INTRODUCTION

On June 29, 2005, Plaintiffs State of Utah and Emery County filed this action under the Quiet Title Act, 28 U.S.C. § 2409a ("QTA").  Plaintiffs seek to quiet title in Emery County against the United States as to rights-of-way for alleged public highways claimed for seven roads – the so-called Mexican Mountain Road, Sid's (Swasey's) Leap Road, Copper Globe Road, Seeger's Hole Road Portions, Link Flat Road Portions, Red Hole Draw Road, and June's Bottom Road.[1]  Plaintiffs contend that they acquired rights-of-way over these roads pursuant to Revised Statute 2477, or R.S. 2477, by the construction, maintenance, and/or use of the roads for the requisite period of time prior to the repeal of the statute on October 21, 1976.  See 43 U.S.C. § 932 (repealed 1976).

As a threshold matter, the Court lacks subject matter jurisdiction over the right-of-way claims asserted in this action for the Mexican Mountain Road, Sid's Leap Road, Copper Globe Road, and Seeger's Hole Road for numerous reasons.[2]  First, the Court lacks jurisdiction over the claim asserted for the western end of the Mexican Mountain Road, estimated at approximately 13.99 miles in length, because the United States has done nothing to interfere with Plaintiffs' use, maintenance, or improvement of this portion of the road.  No justiciable "case or controversy" therefore exists as to this portion of the claim, and it further exceeds the waiver of sovereign immunity under the QTA, which is limited to the adjudication of "a disputed title to real property in which the United States claims an interest." 28 U.S.C. § 2409a(a).

Second, the Court lacks jurisdiction over the claim for the eastern end of the Mexican Mountain Road (estimated at approximately 3.26 miles in length), as well as over the entirety of the

---

[1] All individual or collective references to roads, rights-of-way, routes, and the like, including references to the specific rights-of-way and associated roads claimed in this litigation, are used solely as a matter of convenience based upon the allegations of the Complaint and shall in no way constitute an admission that the claimed rights-of-way and/or roads actually exist.  In addition, for ease of reference, the United States shall refer to the claimed Sid's (Swasey's) Leap Road, Seeger's Hole Road Portions, and Link Flat Road Portions, as identified in the Complaint, as the "Sid's Leap Road," the "Seeger's Hole Road," and the "Link Flat Road," respectively.

[2] The United States does not seek summary judgment on the claims for the Link Flat Road, Red Hole Draw Road, and the June's Bottom Road, but reserves all defenses in connection with these claims.

claims for the Sid's Leap, Copper Globe, and Seeger's Hole roads because the QTA's statute of limitations has run on these claims. The QTA limits its waiver of sovereign immunity to actions commenced within 12 years of the date a county "knew or should have known of the claim of the United States" to the property interest at issue. 28 U.S.C. 2409a(g). As to actions commenced by states (other than actions to quiet title to tide or submerged lands), the QTA limits its waiver of sovereign immunity to actions commenced within 12 years of the date the state had "notice" of the claim, where "the United States or its lessee or right-of-way or easement grantee has made substantial improvements or substantial investments" to the relevant lands or where "the United States has conducted substantial activities pursuant to a management plan . . . or other similar activities" on the lands. 28 U.S.C. 2409a(i), (k).

Here, undisputable evidence shows that the statute of limitations was triggered as to the claims for the eastern end of the Mexican Mountain Road, the Sid's Leap Road, the Copper Globe Road, and the Seeger's Hole Road well before June 29, 1993, the applicable date for purposes of the statute of limitations. The Bureau of Land Management ("BLM") asserted exclusive jurisdiction and control over each of these roads at least as early as the 1970s (and, in the case of the Sid's Leap Road, in 1961) by, for instance, improving the roads, assuming maintenance responsibility over certain of the roads in agreements with Emery County, exercising the authority to close certain of the roads, and other like activities. These actions placed Emery County in a position that it "knew or should have known" of the United States' adverse claims to title to the underlying rights-of-way and likewise provided "notice" to the State of these claims. For each of these roads, the United States or its lessee also have made "substantial improvements or substantial investments" or the United States has "conducted substantial activities pursuant to a management plan . . . or other similar activities" to the relevant lands in satisfaction of 28 U.S.C. § 2409a(i). Accordingly, the statute of limitations has run on – and the Court lacks subject matter jurisdiction over – these claims.

Third, in the alternative, to the extent the Court were to determine that the County's claims to rights-of-way for the eastern end of the Mexican Mountain Road and the entirety of the Sid's

Leap, Copper Globe, and Seeger's Hole roads are barred by the statute of limitations under 28 U.S.C. § 2409a(g), but the State's claims are not barred under 28 U.S.C. 2409a(i) and (k), the State would nonetheless be precluded from bringing these claims by virtue of Utah's legislative scheme.  Under this scheme, the State did not acquire a purported interest in these roads until, at the earliest, the passage of certain legislation in 1993 and likely not until the passage of subsequent legislation in 2000.  Because the statute of limitations on the County's claims had run prior to the passage of this legislation, whatever interest the State may have acquired in these roads pursuant to this legislation was derivative of the County's interest and subject to the same bar applicable to the County's claims.

Finally, the State is barred from bringing these four claims under Utah Code Ann. § 78B-2-201.  This state statute, which serves as an additional limitation on the State's authority to seek to quiet title to real property, precludes the State from bringing claims for  real property, unless "the right or title to the property accrued within seven years before any action or other proceeding is commenced."  Utah Code Ann. § 78B-2-201.  Here, the State's purported interest in the rights-of-way claimed for the eastern end of the Mexican Mountain Road and the entirety of the Sid's Leap, Copper Globe, and Seeger's Hole roads would have accrued more than seven years before this action was filed.  Accordingly, for all these reasons, the Court lacks subject matter jurisdiction over the claims asserted for the Mexican Mountain, Sid's Leap, Copper Globe, and Seeger's Hole roads.

## LEGAL BACKGROUND

### I.    Summary Judgment.

Summary judgment is appropriate when the movant demonstrates that no genuine issue as to any material fact exists and that the movant is entitled to judgment as a matter of law, as shown by the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).  The moving party bears the initial burden of identifying the evidence that it believes forms the basis for its motion and demonstrating the absence of any genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Pelt v. Utah, 539 F.3d 1271,

1280 (10th Cir. 2008).  A party opposing a summary judgment motion may not rest upon the allegations or denials in its pleadings, Fed. R. Civ. P. 56(e), but must demonstrate the existence of facts that could support a finder of fact ruling in its favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  Summary judgment should be entered against a party that fails to produce evidence on an element on which it will bear the burden of proof at trial.  See Celotex, 477 U.S. at 322.  The reviewing court must make all justifiable inferences and resolve all ambiguities in favor of the party opposing summary judgment. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

## II.    Revised Statute 2477.

In the midst of an era of federal land grant statutes aimed at facilitating the settlement of the American West, Congress passed R.S. 2477 as a means of providing public access across unreserved public domain lands.  See generally U.S. Cong. Research Serv., Highway Rights of Way: The Controversy Over Claims Under R.S. 2477, Pamela Baldwin, 93-74A, at 3-4 (Jan. 15, 1993); see also Central Pac. Ry. Co. v. Alameda County, 284 U.S. 463, 472-73 (1932).  From its enactment in 1866 until its repeal in 1976, the statute provided in its entirety: "The right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted."  43 U.S.C. § 932 (repealed 1976).  This grant was self-executing in some states – in other words, an R.S. 2477 right-of-way could come into existence without formal action by public authorities whenever the public sufficiently indicated its intent to accept the grant by establishing a public highway across public lands.  See S. Utah Wilderness Alliance v. BLM, 425 F.3d 735, 770 (10th Cir. 2005).

On October 21, 1976, Congress enacted the Federal Land Policy and Management Act ("FLPMA"), which repealed R.S. 2477 but preserved "any valid" right-of-way "existing on the date of approval of this Act."  Pub. L. No. 94-579, §§ 701(a), 706(a), 90 Stat. 2743, 2786, 2793 (1976).  Accordingly, rights-of-way under R.S. 2477 that were perfected before the statute's repeal in 1976 and which have not lapsed remain valid today.  State or local governments may file suits to quiet title against the United States if they can demonstrate that the grant of a right-of-way was accepted prior to the statute's repeal in 1976 or, where applicable, prior to the earlier withdrawal of the public land

underlying the alleged right-of-way from the operation of R.S. 2477.  In Utah, establishment of an R.S. 2477 right-of-way may be accepted "by continuous public use for a period of ten years" prior to the relevant date.  See S. Utah Wilderness Alliance, 425 F.3d at 771.

III.    **Subject Matter Jurisdiction and Sovereign Immunity.**

   A.    **Case or Controversy.**

   At the most elemental level, the constitutional minimum for the exercise of federal court jurisdiction is a dispute presenting a justiciable "case or controversy."  U.S. Const. art. III, § 2; Allen v. Wright, 468 U.S. 737, 750 (1984).  Federal courts are courts of limited jurisdiction and are presumed to lack jurisdiction unless the contrary affirmatively appears.  See U.S. ex rel. Grynberg v. Praxair, Inc., 389 F.3d 1038, 1048 (10th Cir. 2004).  In other words, an actual, live controversy must exist between the parties before jurisdiction is proper in federal district court.  See Garcia v. Bd. of Educ., 520 F.3d 1116, 1123 (10th Cir. 2008); cf. Unified School Dist. No. 259 v. Disability Rights Ctr., 491 F.3d 1143, 1147 (10th Cir. 2007) ("It is well established that what makes a declaratory judgment action 'a proper judicial resolution of a "case or controversy"' rather than an advisory opinion is the settling of some dispute which affects the behavior of the defendant toward the plaintiff.'" (quoting Cox v. Phelps Dodge Corp., 43 F.3d 1345, 1348 (10th Cir. 1994)).

   B.    **The Doctrine of Sovereign Immunity.**

   The United States, as a sovereign, is immune from suit unless it has waived its immunity.  See Dep't of the Army v. Blue Fox, Inc., 525 U.S. 255, 260 (1999); United States v. Mitchell, 445 U.S. 535, 538 (1980).  "The question whether the United States has waived its sovereign immunity . . . is, in the first instance, a question of subject matter jurisdiction."  McCarthy v. United States, 850 F.2d 558, 560 (9th Cir. 1988).  "When the United States consents to be sued, the terms of its waiver of sovereign immunity define the extent of the court's jurisdiction."  United States v. Mottaz, 476 U.S. 834, 841 (1986).  A court lacks subject matter jurisdiction over a claim against the United States if the United States has not consented to be sued on that claim.  See Harrell v. United States, 443 F.3d 1231, 1234 (10th Cir. 2006); Consejo de Desarrollo Economico de Mexicali, A.C. v.

5

United States, 482 F.3d 1157, 1173 (9th Cir. 2007).

"A federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears." General Atomic Co. v. United Nuclear Corp., 655 F.2d 968, 968-69 (9th Cir. 1981). A waiver of sovereign immunity by the United States must be expressed unequivocally, and purported statutory waivers of sovereign immunity are generally not to be liberally construed. See United States v. Nordic Village, Inc., 503 U.S. 30, 33-34 (1992). A plaintiff bears the burden of proving subject matter jurisdiction. See Aragon v. United States, 146 F.3d 819, 823 (10th Cir. 1998); Thomas v. McCombe, 99 F.3d 352, 353 (9th Cir. 1996).

## IV.    Quiet Title Act.

The QTA provides a limited waiver of the United States' sovereign immunity in civil actions brought "to adjudicate a disputed title to real property in which the United States claims an interest." 28 U.S.C. § 2409a(a). The Act is the "exclusive means by which adverse claimants [may] challenge the United States' title to real property." Block v. North Dakota, 461 U.S. 273, 286 (1983). As a statutory waiver of sovereign immunity, the QTA is to be strictly construed in favor of the United States. See Block, 461 U.S. at 275-76; Humboldt County v. United States, 684 F.2d 1276, 1280 (9th Cir. 1982). Where QTA jurisdiction lies, the court can adjudicate the disputes between the plaintiff and the United States and render judgment between them.

The QTA's waiver of sovereign immunity is expressly limited by a number of conditions. Of initial relevance here, before a district court can exercise jurisdiction under the QTA, "(1) the United States must claim an interest in the property at issue, and (2) there must be a disputed title to real property." Leisnoi, Inc. v. United States, 170 F.3d 1188, 1191 (9th Cir. 1999). The QTA expressly states: "The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest." 28 U.S.C. § 2409a(a) (emphasis added); see also 28 U.S.C. § 2409a(d) ("The complaint shall set forth with particularity the nature of the right, title, or interest which the plaintiff claims in the real property, the circumstances under which it was acquired, and the right, title, or interest claimed by

<u>the United States</u>") (emphasis added).  Therefore, in order to satisfy this condition to the joinder of the United States as a party defendant under the statute, "there must be a conflict in title between the United States and the plaintiff." <u>Lesnoi</u>, 170 F.3d at 1192.

In addition, the QTA generally limits its waiver of sovereign immunity to actions commenced within 12 years of the accrual of the action:

> Any civil action under this section, except for an action brought by a State, shall be barred unless it is commenced within twelve years of the date upon which it accrued. Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States.

28 U.S.C. 2409a(g).  The QTA includes a separate 12-year statute of limitations for actions brought by a State:

> Any civil action brought by a State under this section with respect to lands, other than tide or submerged lands, on which the United States or its lessee or right-of-way or easement grantee has made substantial improvements or substantial investments or on which the United States has conducted substantial activities pursuant to a management plan such as range improvement, timber harvest, tree planting, mineral activities, farming, wildlife habitat improvement, or other similar activities, shall be barred unless the action is commenced within twelve years after the date the State received notice of the Federal claims to the lands.

28 U.S.C. § 2409a(i).  The statute further provides that, "for the purposes of the accrual of an action brought by a State under this section," notice shall be:

> (1) by public communications with respect to the claimed lands which are sufficiently specific as to be reasonably calculated to put the claimant on notice of the Federal claim to the lands, or

> (2) by the use, occupancy, or improvement of the claimed lands which, in the circumstances, is open and notorious.

28 U.S.C. § 2409a(k).

## STATEMENT OF MATERIAL FACTS

**I.      Mexican Mountain Road.**

**A.      General Description of Mexican Mountain Road.**

1.      The claimed Mexican Mountain Road, as described in the Complaint, is 17.35 miles long.  <u>See</u> Compl. at Exh. 5 (Dkt. 1-3 at 1).  A map depicting the alleged location of the Mexican Mountain Road (a/k/a San Rafael River Road), as provided by Plaintiffs to Defendants through

7

discovery, is attached as Exhibit 1.

**B.      Basis of Alleged Case or Controversy and Disputed Title Interest.**

2.      In their Complaint, Plaintiffs allege as the primary basis of their allegations of case or controversy as to the Mexican Mountain Road that Defendants have closed the final five miles of the road (located at its eastern end).  See Compl. (Dkt. 1) at ¶66 ("Defendants have asserted their claim to the dominant estate constituting Plaintiffs' R.S. 2477 right-of-way by closing the final five miles of the road.  The road has been closed by means of a locked gate that prevents vehicular access to the closed portion of the road.").  Plaintiffs fail to allege any actions creating a conflict with respect to the remainder of the road.  Plaintiffs also admit in their discovery responses that, "aside from the Mexican Mountain eastern segment, the United States has done nothing to interfere with the use, maintenance, or improvement of the Mexican Mountain Road."  See Exh. 2 (excerpts from Plaintiffs' discovery responses) at 17-18 (Response to Request for Admission No. 29) (emphasis added); see also id. at 13 (Request for Admission No. 17) (defining "Mexican Mountain eastern segment" as "the eastern-most portion of the Mexican Mountain Road (approximately five miles)").  For purposes of this motion, the United States refers to all portions of the claimed Mexican Mountain Road located to the east of the current point of closure as the "East Mexican Mountain Road" and all portions located to the west of the closure as the "West Mexican Mountain Road."[3/]

---

[3/]As discussed below, the East and West Mexican Mountain Roads have two separate histories, with the East Mountain Road not being constructed until 1975 as an extension of the West Mexican Mountain Road for access to a proposed oil and gas well.  Unlike the West Mexican Mountain Road, the vast majority of the East Mexican Mountain Road is located in the Mexican Mountain Wilderness Study Area ("WSA"), is omitted from a 1980 agreement between the BLM and Emery County describing those portions of the Mexican Mountain Road for which the County asserted the existence of an R.S. 2477 right-of-way, was the subject of a trespass citation issued in 1984 for some unauthorized improvements undertaken by Emery County, and has long been closed to motor vehicle use.  The point of closure marking the dividing line between the East and West Mexican Mountain Roads is located in Section 3 (near its western boundary) just to the west of a significant "washout" in the road, which washout the BLM used as the boundary for the Mexican Mountain WSA.  See Paragraph 15, below; Exh. 3 (Declaration of Michael Dekeyrel in Support of United States' Motion for Partial Summary Judgment) ("Dekeyrel Declaration") at ¶7.a.  The historic documentation and Plaintiffs' description of the mileage of the road to the east of the point of closure are somewhat inconsistent and appear to be based upon rough approximations.  Based on the United States' calculations, the East Mexican Mountain Road is approximately 3.26 miles long.  See Exh. 3 at ¶7.a.

**C.      1975 Application for Permit to Drill Submitted by Wainoco, Inc.**

3.      In the summer of 1975, Wainoco, Inc. ("Wainoco") submitted to the U.S. Geological Survey ("USGS") an Application for Permit to Drill, Deepen, or Plug Back, dated July 16, 1975, for the proposed drilling of an exploratory oil and gas test well, known as the #33-1 Skyline-Federal well.  See Exh. 4 (EC00005461-EC00005495) (copy of Utah Dept. of Nat. Res., Div. Of Oil, Gas and Mining, Oil and Gas Well File, API Well 43–15-30040, as on file with BLM)[4] at EC00005462. The proposed well was to be located in the NW/4SE/4 of Section 1, T. 21 S., R. 13 E., S.L.M.[5]  See id.  The NW/4SE/4 of Section 1 also contains the eastern terminus of the claimed Mexican Mountain Road.  See Exh. 1 (map of claimed Mexican Mountain Road).

4.      In connection with the permit application, Wainoco proposed to construct a new road and airstrip at the eastern end of an existing road for the purpose of accessing the proposed well.  See Exh. 4 at EC00005467-68 (cover letter to permit application at ¶¶1, 2, and 9 referencing existing and planned access roads and proposed airstrip in Sections 1 and 2, as shown on two maps attached as Figures 1 and 2 to the application); id. at EC00005471 (map attached as Figure 2 to permit application showing location of existing road and proposed access road and airstrip); id. at EC00005476 (map attached as Figure 1 to permit application showing same at larger scale); id. at EC00005478 (attachment to USGS environmental evaluation of proposed well stating with respect

[4]The exhibits attached to this memorandum that use the "EC" numbering are true and correct copies of documents produced by the United States as part of its discovery responses in this litigation.  The "EC" numbering represents the Bates stamp numbering that is included on the copies of these documents, as provided electronically on DVDs to Plaintiffs.  The parenthetical descriptions of the contents of these exhibits generally conform to the descriptions of these documents included in the indices provided to Plaintiffs as part of the United States' discovery responses.

[5]The initial permit application erroneously indicated that the well was to be located in the NW/4NE/4 of the referenced Section 1.  See EC00005462.  This description was subsequently corrected to reflect the actual location of the well in the NW/4SE/4 of Section 1.  See, e.g., Exh. 4 at EC00005475 (approved application); Exh. 5 (EC00007963-EC00008078) (BLM Price Field Office file on Mexican Mountain Road) at EC00007964 (well completion report).

to Wainoco: "They also propose to build about 8 miles of new access road to include a airstrip").[6] The existing road was shown as a pre-existing road on the two maps submitted as part of the permit application, whereas the proposed access road and airstrip were hand-drawn on these maps to show the proposed location of the road that was to be constructed to the well.  See Exh. 4 at EC00005471 (Figure 2); id. at EC00005476 (Figure 1).  The existing road corresponds to the approximate location of the West Mexican Mountain Road, and the proposed access road corresponds to the approximate location of the East Mexican Mountain Road.  See Dekeyrel Declaration at ¶7.b.

     5.    In processing the permit application, the USGS consulted with the BLM, which acknowledged that the proposed access road "to the drill site from the existing road will require one dugway about 300 feet long and one about 400 feet long" and that the proposed airstrip would be a "widened section of the access road . . . 2,000 feet long, and 60 feet wide."[7]  Exh. 6 (EC00000557-EC00000597) (Case file for individual well record UTU-19175) at EC00000584.  The BLM also indicated that the new access road "will be closed in rehabilitation and blocked where it comes out of Joe Walker Canyon in Sec. 2: T. 21 S., R. 13 E" and that "Wainoco will be notified before the location is abandoned" if  "the BLM determines that it is in the public interest to leave the road open."  Id.  In addition, the BLM determined that "a tramroad right-of-way permit is required for that portion of the access road between the county road at the San Rafael Campground and leases held by the company."[8]  Id. at EC00000585.  "Tramroad applications and bonding forms were sent to

---

[6]The USGS apparently miscalculated the length of the proposed access road and airstrip in referring to it as "about 8 miles."  Compare ¶7, below (indicating new road was approximately 4 miles).

[7]In 1975, the USGS had primary responsibility for the approval of applications for permits to drill proposed oil and gas wells located on federal public lands, but would consult with the BLM regarding surface management and any appropriate surface use conditions to be required in connection with the approval of the applications.  See Dekeyrel Declaration at ¶7.b.

[8]Department of Interior regulations in effect in 1975 defined "tramroads" on public lands as "including tramways, railroads, and motor-truck roads to be used in connection with mining, quarrying, logging, and manufacturing of timber."  43 C.F.R. § 2811.0-5 (1975).  These regulations described the terms and conditions upon which the BLM might authorize the use of tramroads, including potential bonding, application, and rental requirements. 43 C.F.R. §§ 2811.0-3, 2811.1.

Wainoco on July 3, 1975," and the BLM set the required bond at $5,000.  Id.

6.     Following the completion of environmental review by the USGS on July 2, 1975, see Exh. 4 at EC00005477-0005480, the USGS approved the permit application on July 22, 1975.  See id. at EC00005475.  The BLM also separately issued a tramroad permit "for the use of tramroads under the jurisdiction of the Bureau of Land Management," and Wainoco submitted a $5,000 bond in connection with the tramroad permit to cover "the proper maintenance and repair of the road during periods of use and, if required, payment of a road use fee to be determined by the Authorized Officer of the Bureau of Land Management."   See Exh. 5 at EC00007970; see also id. at EC00007983 (July 3, 1975 letter from BLM to Wainoco transmitting for completion "temporary tramroad right-of-way application and permit, and the forms for required bonding.").

7.     Following these approvals, on September 3, 1975, a geologist with the BLM completed an inspection of the road construction completed to date.  See id. at EC00007978.  The report prepared for that inspection indicates that construction of the first 14.7 miles of the road had been completed and that construction of the remaining four miles was still on-going.  Id.  The report further indicates that at the 14.7 mile point the existing road "takes off in different direction" and that it was "[h]ard to say what the last four miles will be like yet."[9]  Id. at EC00007978.

8.     On September 13, 1975, drilling of the well was commenced, but the well was subsequently plugged after it proved to be a "dry hole."  Id. at EC00007964.  On October 8, 1975, a BLM outdoor recreation planner completed an inspection of the rehabilitation work performed to date for the well and road.  See id. at EC00007977.  The report prepared in connection with that inspection determined that "[t]he road leading onto the lease as well as the new road to the drill site look fine."  Id. (emphasis added).  The report also instructed: "Do not harrow rip or seed the airstrip. We want the strip left in its present condition so that access by air can be maintained."  Id.

---

[9]The 14.7 miles of existing road and the four miles of new road described in the report, for a total of 18.7 miles, are somewhat longer than the 17.35 miles alleged by Plaintiffs as the total length of the claimed Mexican Mountain Road.  See Compl. at Exh. 5 (Dkt. 1-3 at 1).  These discrepancies are presumably based largely upon the use of rough approximations for the 1975 project.

9.      The BLM completed a final inspection of the reclamation work on October 22, 1975, at which time the BLM determined that "rehabilitation and cleanup" of the drill site and access road had been performed to the agency's satisfaction.  See Exh. 6 at EC00000559.  The BLM also decided at that time that "the drill pad and the road to the east end of the airstrip would be ripped and seeded, leaving the airstrip and remainder of the road intact to facilitate access to the area."[10]  Id.

**D.      1980 Memorandum of Understanding.**

10.      On November 5, 1980, Emery County and the BLM entered into a Memorandum of Understanding to Clarify Road Construction and Maintenance Responsibilities on Public Land in Emery County Between the United States of America, Department of the Interior, Bureau of Land Management and the Board of County Commissioners, Emery County, Utah.  See Exh. 7 (EC00006044-00006078) (1980 MOU, with attachments).  The 1980 MOU states that the BLM "will be responsible for the maintenance of its existing roads or roads constructed or acquired by the Bureau for the administration of public lands in Emery County" and, in turn, the "County will be responsible for the maintenance of its existing roads or roads constructed or acquired by the County which serve[] general public purposes."  See id. at EC00006046, ¶¶1-2.

11.      The 1980 MOU sets forth in its Attachments A and B "[t]he existing roads and maintenance responsibility of the County and the Bureau."  Id. at ¶3.  Attachment A consists of "a six sheet Emery County General Highway Map series, [which] shows the county roads as they existed as of October 21, 1976[11] in red and existing Bureau roads in blue."  Id.  Attachment B consists of a table, which "details these roads by length, beginning and ending points and general standard."  Id.

12.      The 1980 MOU further states:

---

[10]The BLM subsequently decided to keep the east end of the road closed at the point at which a significant, natural washout had developed.  See Paragraph 15, below.

[11]October 21, 1976 is the date upon which Congress repealed R.S. 2477 through the enactment of FLPMA, but subject to "any valid" right-of-way "existing on the date of approval of this Act."  Pub. L. No. 94-579, §§ 701(a), 706(a), 90 Stat. 2743, 2786, 2793 (1976).

> With regards to public land, the County agrees that the roads shown and listed in Attachments A and B <u>are all of the roads indicated under RS 2477</u> (43 U.S.C. 932) as of October 21, 1976, that any new road, the extraction of road material therefrom, or the realignment or relocation of a road will be in compliance with the right-of-way procedure of the Bureau established pursuant to the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701-1782) and Title 43 of the Code of Federal Regulations 2800 et seq.  Attachment A is hereby accepted as the map defined in proposed Section 2802.3-6(d) published in FR October 9, 1979 and the roads referred to in Section 27-12-26, Utah Code Ann., 1953.[12]

<u>Id.</u> at EC00006047-00006048, ¶6 (emphasis added).

13.     The table included as Attachment B to the MOU identifies a certain "Mexican Bend" road, as a "4WD," or four-wheel drive road, of 11 miles in length, with termination points in Section 14, T. 20 S., R. 11 E., and Section 4, T. 21 S., R. 13 E., as the maintenance responsibility of the County.  <u>See id.</u> at EC00006063.  Likewise, two of the maps included in Attachment A designate in red (denoting County maintenance responsibility) a road with these same termination points and of this same approximate length.  <u>See</u> EC0006075-00006076; Dekeyrel Declaration at ¶8.a.

14.     The Mexican Bend road identified in Attachments A and B to the MOU appears to be approximately the same road as the West Mexican Mountain Road.  <u>See</u> Dekeyrel Declaration at ¶8.a.  The Mexican Bend road begins in the same section as the western terminus of the claimed Mexican Mountain Road and courses through the same sections and along the same approximate route as that depicted on the map of the claimed road provided by Plaintiffs to Defendants through discovery.  <u>Compare</u> Exh. 1 (map of claimed Mexican Mountain Road) <u>with</u> Exh. 7 at EC00006063 and EC0006075-00006076; <u>see also</u> Dekeyrel Declaration at ¶8.a.  The East Mexican Mountain Road, located in Sections 3, 2, and 1, T. 21 S., R. 13 E., is not described or depicted in either

---

[12]The proposed rule included in the referenced Federal Register provided, in part: "Any person, State or local government which has constructed public highways under authority of R.S. 2477 (43 U.S.C. 932, repealed October 12, 1976), shall file within 3 years of the effective date of these regulations a map showing the location of <u>all such public highways constructed under R.S. 2477</u>." 44 Fed. Reg. 58,106, 58,118 (Oct. 9, 1979) (emphasis added).  Notwithstanding the County's efforts to comply with the proposed rule in the 1980 MOU, the BLM never adopted the rule.  The Utah Code provision referenced in the 1980 MOU, Utah Code Ann. § 27-12-26 (1953), was re-numbered in 1998 and is currently codified as Utah Code Ann. § 72-3-107.  This statute provides, in part: "The county executive of each county shall determine all county roads existing in the county and prepare and keep current plats and specific descriptions of the county roads."  Utah Code Ann. § 72-3-107(1).

Attachment A or Attachment B.  See id.

     **E.**    **Designation of Mexican Mountain Wilderness Study Area in 1980.**

    15.    On November 14, 1980, the United States published a notice of the designation of the Mexican Mountain WSA in the Federal Register.  See 45 Fed. Reg. 75,602 (Nov. 14, 1980).  The lands underlying the West Mexican Mountain Road were "cherry-stemmed" out of the WSA.  See Exh. 8 (excerpts from Deposition of Martha Gail Hahn, former BLM Price Field Office employee involved in WSA inventory process, identified as a potential witness for the United States) at 37 and 38, lines 7-10; Exh. 5 at EC00008042; Dekeyrel Declaration at ¶9.a.  By contrast, the lands underlying the vast majority of the East Mexican Mountain Road were included in the WSA, with the western boundary of the WSA in this area being drawn at a natural washout located approximately 3.26 miles from the east end of the claimed Mexican Mountain Road and just to the east of the current point of closure.  See id. at 30, lines 19-22; id. at 38, lines 7-20 (agreeing that "WSA boundary was drawn right there at the point of the washout."); Dekeyrel Declaration at ¶9.a.; Exh. 9 (EC00005971-EC5972) (BLM Manager, San Rafael Resource Area, Staff Report History of Mexican Mountain Road and Closure) at EC00005971 (portion of road constructed in connection with the now-abandoned 1975 well "eventually fell into disrepair and washed out at the place where the present barricade is located.  In the early 1980's when the WSA inventory was done, the line was drawn at the place of the present barricade.  The reasoning was that since the road was washed out, it was no longer usable and therefore did not qualify as either a road or a way.").  When the BLM inventoried these lands prior to the WSA designation, it determined that the washout served as a "physical barrier . . . to further travel," Exh. 8 at 122, lines 19-25; id. at 123, lines 1-3, and the road beyond the washout appeared to be "not traveled" and "returning to a more natural state."  Id. at 122, lines 13-14; see also id. at 124, lines 4-6 (affirming that "the area appeared to be naturally reclaiming past the washout.").

     **F.**    **1984 Trespass Citation for Improvements Completed by Emery County on the East Mexican Mountain Road.**

    16.    On September 4, 1984, the BLM discovered what it considered to be unauthorized

road maintenance work that had been performed on the East Mexican Mountain Road.  See Exh. 10 (EC00006459-EC00006567) (additional BLM closure records for Mexican Mountain Road) at EC00006459.  On September 19, 1984, the BLM determined "the extent of the road maintenance work and that [the] Emery County Road Department did the work," id., apparently at the request of the livestock grazing permittee for the area.  See Exh. 11 (EC00001042-EC00001048) (excerpts from BLM Price Field Office Wilderness Case File UT-060-054, including January 12, 1987 letter from BLM to Senator Orrin Hatch) at EC00001042; Exh. 10 at EC00006459.  The work consisted of grading an estimated 2.5 miles of the portion of the road located in the Mexican Mountain WSA and "installing a culvert in a steep banked wash."  See Exh. 10 at EC00006459.

17.     The BLM considered the work to be unauthorized both because it did not comply with the Interim Management Policy ("IMP") for the management of WSAs and because the work extended to the east of Section 4, T. 21 S., R. 13 E., contrary to the parties' agreement in the 1980 MOU concerning maintenance of the Mexican Mountain Road.  See Exh. 10 at EC00006459; Exh. 5 at EC00008042 (letter from BLM to County Commission enclosing trespass citation, which states: "In identifying the Mexican Mountain WSA boundaries, the existing county road (identified in the 1980 BLM/Emery County Road Maintenance Memorandum of Understanding) was 'cherry-stemmed' to the middle of Section 4, T. 21 S., R. 13 E., SLM.  Therefore, when the road was maintained on into Section 1 (approximately 3 miles), it was done contrary to our agreement and in violation of the wilderness interim management policy and guidelines.").

18.     On November 28, 1984, the BLM sent a trespass notice to the Emery County Road Department regarding the unauthorized road maintenance.  See Exh. 10 at EC00006459; Exh. 5 at EC00008042-EC00008046 (letter of enclosure to County, trespass notice, and associated materials).  On November 29 and November 30, 1984, the Emery County Road Department undertook initial activities to reclaim the unauthorized improvements and remove the culvert.  See Exh. 10 at EC00006460; Exh. 11 at EC00001042 (letter from BLM to Senator Orrin Hatch discussing completion of reclamation work in November of 1984); Exh. 11 at EC00001044 (December 1, 1986

letter from BLM to Emery County Commission concerning completion of reclamation work).

19.     On December 27, 1984, BLM field personnel checked the completeness of the reclamation work. See Exh. 10 at EC00006460.  The BLM also completed an after-the-fact environmental assessment under the National Environmental Policy Act ("NEPA") and, on January 4, 1985, issued a finding of no significant impact on the decision to reclaim the unauthorized road work.  See id.; Exh. 5 at EC00008047-00008078.

20.     After the completion of the initial reclamation work, the BLM periodically monitored the area throughout 1985 and into the summer of 1986 to determine, among other things, the sufficiency of the rehabilitation efforts on the trespass road.   See Exh. 10 at EC00006460.  This monitoring detected some unauthorized motor vehicle use on the reclaimed portions of the road.  See id. at EC00006460-EC00006461.

21.     In September 1986, "Emery County offered to assist with rehabilitation by hauling in large boulders to close the road." Id. at EC00006461.  On October 8, 1986, the "Emery County road crew used a large end-loader" and an individual by the name of Ed Johnson "used a BLM backhoe to pile dirt in the roadbed near the culvert site (SWNW Sec. 3, T21S, R13E)." Id.  "The crews then placed large boulders near the end of the cherrystem in the roadbed to prevent vehicular access, while maintaining access for livestock (NWSW, Sec. 3, T21S, R13E)." Id.; see also Exh. 11 at EC00001043; Exh. 12 (EC00002290; EC00002325; EC00002354; EC00002366; EC00002374; EC00002482; EC00002585-EC00002586; EC00002591) (excerpts from San Rafael Proposed Resource Management Plan and Final Environmental Impact Statement) at EC00002482 ("A reclaimed access road to an abandoned drill hole parallels the river's north side for 3 miles in the Mexican Bend area.  The road was closed to motorized use in 1986 to allow rehabilitation in compliance with wilderness interim management policy (IMP) requirements.").

22.     A letter from the Emery County Board of Commissioners to the BLM State Director, dated November 12, 1986, states that "Emery County, in closing this portion of the road into the Mexican Mountain WSA, consents to the closure of this section under protest and with much

16

opposition." Exh. 11 at EC00001046-EC00001047.

23.     On October 15, 1986, BLM personnel undertook "additional reclamation by hand to improve access for livestock" and installed a temporary sign "to explain the purpose of the closure." Exh. 10 at EC00006461; see also id. at EC00006463 (text of sign).  On January 13, 1987, a BLM employee (Mervin Miles) "seeded the disturbed areas with a mixture of native grasses and shrubs." Id. at EC00006461.

**G.     1991 San Rafael Resource Management Plan.**

24.     On May 24, 1991, the BLM approved the San Rafael Final Resource Management Plan ("1991 Plan").  See Exh. 13 (EC00002167-2174; EC00002243-EC00002246; EC00002261) (Record of Decision ("ROD") and excerpts from 1991 Plan) at EC00002167-EC00002173.  The Plan and its underlying Final Environmental Impact Statement ("FEIS") completed under NEPA were subject to public notice and comment procedures.  See id. at EC00002170-EC00002171 (provisions of ROD describing public participation process); 54 Fed. Reg. 36,059 (Aug. 31, 1989) (notice of availability of proposed Plan and FEIS).

25.     The 1991 Plan distinguished among five potential classifications by which the lands covered by the Plan could be managed for off-road vehicle, or "ORV use" – (1) open to ORV use; (2) open with seasonal restrictions; (3) limited to existing roads and trails; (4) limited to designated roads and trails; and (5) closed to ORV use.  See Exh. 13 at EC00002246.  The Plan designated as "closed to ORV use" the San Rafael Canyon Area of Critical Environmental Concern ("ACEC") (Lower Portion).  See id. at EC00002246, EC00002261.

26.     The San Rafael Canyon ACEC (Lower Portion) contains the vast majority of the East Mexican Mountain Road, and the boundary of the ACEC in the vicinity of this road conforms to the approximate boundary of the Mexican Mountain WSA.  See Dekeyrel Declaration at ¶11.b.; Exh. 9 at EC00005971 ("In the late 1980s, designation of ACECs were considered as part of the RMP process.  Using the same reasoning as was used for the WSA boundary, a line was drawn at the present barricade to delineate the high value scenic area in which roads were closed."); Exh. 14

(excerpts from Deposition of Tom Gnojek, BLM outdoor recreation planner in Price Field Office designated as potential witness for Defendants) at 37, lines 24-25 and 38, line 1 ("I was concerned about where it hits the boundary of the ACEC or the WSA – they're close if not located at the same location").

27.     The 1991 Plan states that "ORV designations do not distinguish between recreational and nonrecreational use," but that "ORV use in an area designated closed or limited may be allowed under an authorized permit." Id. at EC00002246.

28.     Consistent with the approved 1991 Plan, the 1989 FEIS completed in the planning process preceding the Plan's approval proposed to close the San Rafael Canyon ACEC (Lower Portion) to ORV use. See Exh. 12 at EC00002374. The FEIS also states that the Mexican Mountain Road might be considered for a right-of-way grant through a process completed in accordance with NEPA, but only if "it is determined necessary for public safety (i.e., access for river rescue operations, etc.)." Id. at EC00002325. The boundaries of the San Rafael Canyon ACEC (Lower Portion), as proposed by the 1989 FEIS, are the same as the boundaries of the San Rafael Canyon ACEC (Lower Portion) approved by the 1991 Plan. See Dekeyrel Declaration at ¶11.a.

II.     **Sid's Leap Road.**

        A.      **General Description of Sid's Leap Road.**

29.     The claimed Sid's Leap Road, as described in the Complaint, is 5.91 miles long. See Compl. at Exh. 4 (Dkt. 1-2 at 10). A map depicting the alleged location of the Sid's Leap Road, as provided by Plaintiffs to Defendants through discovery, is attached as Exhibit 15.

        B.      **1961 East Johnny's Fork Range Improvement Project.**

30.     In 1961, the BLM undertook a range improvement project for the so-called "East Johnny's Fork Road." See Exh. 16 (EC00005648-EC00005652) (excerpts from BLM Price Field Office Range Improvement File, East Johnny's Fork Road). As described in the BLM's Project Estimate form, the purpose of the project was to "facilitate utilization of the area by sheep, by hauling water into [a] presently inacessible area." See id. at EC00005651.

18

31.    The East Johnny's Fork Road, as depicted on two hand-drawn location plats included in the project file, includes a spur that heads north from the road's initial segment, which spur is located in Sections 20 and 17, T. 21 S., R. 13 E., SLM.  See id. at EC00005649, EC00005652.  This spur is located in the same sections (Sections 20 and 17) as the southern-most portion of the claimed Sid's Leap Road and appears to be in the same approximate location as significant portions of approximately the first mile of the claimed Sid's Leap Road at its southern and western end.  See Dekeyrel Declaration at ¶4.a.; compare Exh. 15 (map of claimed Sid's Leap Road) with Exh. 16 at EC00005649, EC00005652.

32.    A Project Completion Form, dated July 27, 1961, indicates that the project was started and completed in May 1961.  See Exh. 16 at EC00005648.  The completed project is described on the form as: "Class 3 road constructed with bulldozer down to San Rafael River so sheep camp could be moved into area [] and for water hauling for better utilization."  Id.  The BLM is assigned maintenance responsibility for the completed road, and the form reflects that no easement to a third party was granted for the road.  See id.

33.    The Project Estimate form indicates that the BLM initially anticipated the project would be funded using "S & M" funds, see id. at EC00005651, which reference appears to be a reference to federal "Soil and Moisture" conservation funds.  See Dekeyrel Declaration at ¶4.b.; see also Exh. 16 at EC00005648 (reference to "Soil & Moisture" funds on Project Completion Report).  However, the final Project Expenditure report states that the project was funded by "Account 511" in the amount of $25.00 and "GSA Motor Pool" in the amount of $43.30.  See Exh. 16 at EC00005650.  The "GSA" is a common reference to the federal General Services Administration.  See Dekeyrel Declaration at ¶4.b.  Although the meaning of "Account 511" is unclear, the context in which the reference appears indicates that it was also a federal funding source.  Id.  Federal accounts at that time were typically designated by three-digit numbers.  Id.  The project file indicates that "Range Users" contributed no funds to the project.  See Exh. 16 at EC00005648, EC00005650.

C.    **Sid's Leap Road and the 1980 MOU.**

34.     The 1980 MOU does not identify the Sid's Leap Road in Attachments A and B.  See Exh. 7 at EC00006050-EC00006078; Dekeyrel Declaration at ¶8.b.

35.     The 1980 MOU does identify the "Sinkhole-Jackass Bench Loop" road (Road No. 6755) as the BLM's maintenance responsibility.   See Exh. 7 at EC00006066; EC00006075-EC00006076.  This BLM road appears to provide the sole access to the claimed Sid's Leap Road. See Dekeyrel Declaration at ¶8.b.; see also Exh. 17 (excerpts from Deposition of Ray Petersen, designated Rule 30(b)(6) witness for Plaintiffs) at 103, lines 1-2, 6, 17-18, 21-23 (referring to "the road to the south providing access to the claimed Sid's Leap road," possibly known as the "Jackass Flat" road, as a "BLM system road").

**D.     Sid's Leap Road and the Mexican Mountain WSA**.

36.     The lands comprising the Mexican Mountain WSA underlie approximately the eastern-most 2.28 miles of the claimed Sid's Leap Road.  See Dekeyrel Declaration at ¶9.b.

**E.     Sid's Leap Road and the 1991 Plan.**

37.     The San Rafael Canyon ACEC (Lower Portion), as proposed by the 1989 FEIS and approved by the 1991 Plan, contains approximately the eastern-most 2.75 miles of the claimed Sid's Leap Road, and the boundary of the ACEC in the vicinity of this road includes and extends beyond the boundary of the Mexican Mountain WSA.  See Dekeyrel Declaration at ¶11.c.

38.     In furtherance of the 1991 Plan's closure of the San Rafael Canyon ACEC (Lower Portion) to ORV use, see SOF at ¶25, the BLM on August 24, 1993 subsequently "installed 8 carsonite or metal signs within [the] WSA/ACEC, along the road to [Sid's] Leap."  See Exh. 18 (EC00006394-EC00006395) (WSA IMP Monitoring Record excerpted from BLM Price Field Office WSA IMP files) at EC00006394; Exh. 14 (excerpts from Gnojek Deposition) at 37, lines 4-10, 16-18 ("I subsequently signed that closed because that would have been after the RMP had closed that area. The 1991 San Rafael Resource Management Plan had closed that.  That was within a closed area because of the lower–I believe the lower San Rafael Canyon ACEC, area of critical environmental concern. . . . [I]n the early '90s [we] started more intensely look at that road to try to maintain the

closure that was prescribed by the RMP"); id. at page 40, lines 1-4 ("I think that's the line.  That's

where the ACEC boundary is.  We had posted it in various places along that [Sid's Leap] road.");

id. at 42, lines 21-23 (east end of Sid's Leap Road "was in a closed area, so that decision had been

made in the 1991 RMP.").  On a map attached to the staff report prepared in connection with the sign

postings, the signs are described as "WSA/no vehicle signs" and are shown by hand-drawn notations

as being located along approximately the last few miles of the claimed Sid's Leap Road as it

approaches an area known as "Swazys [sic] Leap."   See Exh. 18 at EC00006395; Dekeyrel

Declaration at ¶12.

### III.    Copper Globe Road.

#### A.    General Description of Copper Globe Road.

39.    The claimed Copper Globe Road, as described in the Complaint, is 15.33 miles long.

See Compl. at Exh. 7 (Dkt. 1-5 at 1).  A map depicting the alleged location of the Copper Globe

Road, as provided by Plaintiffs to Defendants through discovery, is attached as Exhibit 19.

#### B.    1963 Recreation Inventory.

40.    In a 1963 recreation inventory that the BLM completed for the Copper Globe

Recreation Area, the BLM is identified as the owner of 11 miles of dirt road in the area.  See Exh.

20  (EC00008540-EC00008548;  EC00008751-EC00008759)  (excerpts  from  1963  recreation

inventory) at EC00008752.  This dirt road is the only road listed for this area in the inventory, see

id., and its location, as shown on a map included with the inventory, conforms to the general location

of the claimed Copper Globe Road.  See id. at EC00008759; Dekeyrel Declaration at ¶5.  The BLM

consulted the State Highway Department and State recreation personnel in connection with the 1963

inventory.   See Exh. 20 at EC00008544, EC00008546.

#### C.    1971 Memorandum of Understanding.

41.    In an April 30, 1971 MOU between the BLM and Emery County concerning road

construction and maintenance responsibilities, the parties agreed that the BLM had maintenance

responsibility for the so-called "Cat Canyon" road, with termination points in Section 25, T. 23 S.,

R. 8 E., and Section 2, T. 23 S., R. 9 E.  Exh. 21 (EC00000538-EC00000556) ("1971 MOU") at EC00000542 ("The Bureau will be responsible for the maintenance of roads constructed or acquired by the Bureau which are needed and used primarily for the administration of the public lands in Emery County."); EC00000554 (listing "Cat Canyon" road as BLM's maintenance responsibility).

42.     The Cat Canyon road referenced in the 1971 MOU appears to comprise the majority of the claimed Copper Globe Road.  See Dekeyrel Declaration at ¶6.a. The referenced Section 25 contains the western terminus of the claimed Copper Globe Road, and the northern-most portion of the claimed Copper Globe road runs through the referenced Section 2.[13]  See Exh. 19 (map of claimed Copper Globe Road).  Plaintiffs' map does not shown any other roads running through these same sections, and an area commonly known as Cat Canyon, as shown on Plaintiffs' map, is located at the western end of the claimed Copper Globe Road.  See id.; Dekeyrel Declaration at ¶6.a.

**D.     Copper Globe Road and the 1980 MOU.**

43.     The 1980 MOU between the BLM and Emery County identifies the so-called "Justensen Flat-Kimball Wash" road (Road No. 6845), with a western termination point in Section 25, T. 23 S., R. 8 E., and a northern termination point in Section 33, T. 22 S., R. 9 E., as the BLM's maintenance responsibility.  See Exh. 7 at EC00006066, EC00006078.

44.     The "Justensen Flat-Kimball Wash" road, as referenced in the 1980 MOU, appears to comprise the vast majority of the claimed Copper Globe Road.  See Dekeyrel Declaration at ¶8.c. The referenced Section 25, T. 23 S., R. 8 E., and Section 33, T. 22 S., R. 9 E., contain the western and northern points of termination of the claimed Copper Globe Road, see Exh. 19 (map of claimed Copper Globe Road), and the area through which the north end of the claimed road runs is commonly known as the Justensen Flat-Kimball Wash area.  See Dekeyrel Declaration at ¶8.c. The location of the referenced "Justensen Flat-Kimball Wash road" (Road No. 6845), as depicted on Attachment A to the 1980 MOU, also conforms to the approximate location of the claimed Copper

---

[13]Plaintiffs' claim for the Copper Globe Road continues into Section 3, T. 23 S., R. 9 E., and a small portion of Section 33, T. 22 S., R. 9 E.  See Exh. 19.

Globe Road.  Compare Exh. 7 at EC00006078 with Exh. 19 (map of claimed Copper Globe Road); see also Exh. 22 (EC00000783-EC00000794) (copy of miscellaneous BLM road maintenance and associated records for Justensen Flat-Kimball Wash Road) at EC00000785 (map designating approximate location of Justensen Flat-Kimball Wash Road); Dekeyrel Declaration at ¶8.c.

45.     Ray Petersen, Emery County's Public Lands Coordinator and designated Rule 30(b)(6) witness for Plaintiffs, testified in his deposition in this case that maintenance of the Copper Globe Road is "totally up to the BLM" and that the County has performed maintenance on that road "only at the request of the BLM or working with them."  Exh. 17 (excerpts from Petersen deposition) at 95, lines 12-15; see also id. at 97, lines 10-12 ("We don't go on and perform [maintenance] on BLM road[s] unless there is some prior conversation about it or agreement," such as the agreement the County had for the Copper Globe Road).

**E.     The State's Grant of an Exclusive Easement to the United States for the Portion of the Copper Globe Road Located Over State Lands.**

46.     By letter dated February 26, 1985, the BLM transmitted to the Utah Division of State Lands & Forestry an appraisal report completed by the BLM on the estimated value of a road easement that the BLM proposed to acquire over certain lands owned by the State of Utah.[14]  See Exh. 23 (EC00005385-EC00005390) (BLM Price Field Office Case File UTU-54657) at EC00005388-EC00005390.  On August 8, 1985, the State of Utah subsequently granted the United States an "exclusive" easement for these lands, and the easement was recorded with the Emery County Recorder on September 26, 1985.  See id. at EC00005386-EC00005387.  By the terms of the easement and in consideration of the payment of $800.00, the State of Utah granted to the United States "an exclusive easement to locate, construct, use, maintain, improve, relocate, and repair a road over and across" lands described as the NW/4SW/4, NE/4SW/4, NW/4SE/4, SW/4SE/4, SE/4SW/4, and SW/4SW/4 of Section 2, T. 23 S., R. 9 E., S.L.M.  See id. at EC00005386.

---

[14]Pursuant to the Utah Enabling Act, the United States granted the State of Utah title to lands located in Sections 2, 16, 32, and 36 throughout the State as trust lands for the benefit of its schools and institutions, subject to certain exceptions.  See 28 Stat. 107 (July 16, 1894).

47.     The lands described in the appraisal report and easement underlie the entirety of the claimed Copper Globe Road, as it crosses State lands in said Section 2, and no other State lands underlie any portion of the claimed Copper Globe Road.  See Exh. 19 (map of claimed Copper Globe Road); Dekeyrel Declaration at ¶10.

48.     The easement further provides that it:

> is for the use of the above described property as a road by the UNITED STATES OF AMERICA, its licensees and permittees including the right of access for the people of the United States generally to lands owned, administered, or controlled by the UNITED STATES for all lawful and proper purposes subject to the rules and regulations of the Secretary of the Interior.

See Exh. 23 at EC00005386.  The State reserved "the right to utilize said easements for ingress and egress and access to and from the lands owned by Grantor on both sides of the road for all lawful purposes."  Id.  However, this reservation was on the condition that "such use shall not unreasonably interfere with the easement granted herein" and that, should any such interference occur, "Grantor covenants and agrees to assume the obligation for the cost of such interference."  Id.

**F.     BLM's Maintenance and Improvement of the Copper Globe Road.**

49.     A BLM maintenance log indicates that, in 1992, the BLM bladed the entire length of the Copper Globe Road (referred to in the report as the Justensen-Flat Kimball Wash Road, Road No. 6845).[15/]  See Exh. 22 at EC00000789.

50.     A March 23, 1995 BLM report details extensive maintenance and improvements that the agency undertook for the entirety of the Copper Globe Road (referred to in the report as the Justensen Flat-Kimball Wash Road (6845)).  See Exh. 22 at EC00000790-EC00000794.  The work performed included surface blading and grading; installation of ditches, drainage dips, and water bars; rebuilding of shoulders; and realignment activities.  See id.  The report further indicates that the BLM ended its road maintenance at the north end of the road because "Emery County maintains [the] road beyond this point."  Id. at EC00000794.

---

[15/]This road name and number conforms to that listed in the 1980 MOU for what appears to be the vast majority of the claimed Copper Globe Road.  See discussion, above.

**IV.**     **Seeger's Hole Road.**

**A.**     **General Description of Seeger's Hole Road.**

51.     The claimed Seeger's Hole Road, as described in the Complaint, is 11.99 miles long. See Compl. at Exh. 10 (Dkt. 1-6 at 22).  A map depicting the alleged location of the Seeger's Hole Road, as provided by Plaintiffs to Defendants through discovery, is attached as Exhibit 24.

**B.**     **Seeger's Hole Road and the 1971 MOU**

52.     The 1971 MOU identifies a "Seagers [sic] Hole" road, with a length of six miles and termination points in Section 25, T. 25 S., R. 7 E., and Section 2, T. 26 S., R. 8 E., as under the maintenance responsibility of the BLM.[16]  See Exh. 21 at EC00000544.  The "Seagers Hole" road identified in the 1971 MOU appears to comprise approximately the western-most six miles of the claimed "Seeger's Hole Road" (herein "Upper Seeger's Hole Road").  See Dekeyrel Declaration at ¶6.b.i.  The referenced Section 25 contains the western terminus of the claimed Seeger's Hole Road, as shown on the map of the claimed Seeger's Hole Road provided by Plaintiffs to Defendants.  See id.; Exh. 24 (map of claimed Seeger's Hole Road).  The referenced Section 2 is a section of State land that underlies a portion of the claimed Seeger's Hole Road and which is located approximately six miles from the road's western point of beginning.  See id.  No other roads shown on the map of Plaintiffs' claim run through these two sections.  See id.

53.     The remainder of the claimed Seeger's Hole Road, which is not described in the 1971 MOU, continues through Section 2 in three forks that split off in various directions, but generally heading to the northeast and southeast.  See Exh. 24; Dekeyrel Declaration at ¶6.b.ii.  The upper fork heads to an overlook in Section 2 above the Seeger's [or Seger's] Hole area.  See id.  The middle and lower forks are located beyond a steep and rocky "dugway" that drops down into the Seeger's Hole area as the claimed road continues through and past Section 2.  See id.  The Upper Seeger's Hole Road provides the only motor vehicle access to those portions of the claimed road located below and

---

[16]The 1980 MOU does not identify Seeger's Hole Road in Attachments A and B.  See Exh. 7 at EC00006050-EC00006078; Dekeyrel Declaration at ¶8.d.

to the east of the dugway in Section 2.[17]  See id.

54.     Ray Petersen acknowledged in his deposition as a Rule 30(b)(6) witness for the Plaintiffs that the County considers the Upper Seeger's Hole Road to be a "BLM system road."  See Exh. 17 (excerpts from Petersen Deposition) at 107, lines 13-22 (acknowledging that County regards the portion of the claimed Seeger's Hole Road to west of dugway as a "BLM system road"); id. at 108, lines 9-11 (stating that he "assumes" the claimed Seeger's Hole Road to the west of the dugway is a BLM system road because "if it was an Emery County road, we would be maintaining it.").

**C.     BLM's Grading of the Seeger's Hole Road.**

55.     The BLM has actively and continuously maintained the Upper Seeger's Hole Road on a near annual basis since at least 1978.  See Exh. 25 (excerpts from Williams Deposition) at 39 lines, 12-13 (BLM employee testifying that BLM grades portion of Seeger's Hole Road "just about every year."); id. at 47, lines 23-25, and 48, lines 1-4 (testifying as to Upper Seeger's Hole Road above the Hole area that the BLM has been maintaining the road "ever since I started in '88, or not '88, '78.  And prior to that time, I'm sure that they were the ones who maintained it."); id. at 48, lines 15-20 (testifying that, since 1978, if the BLM had not graded the road once a year, he would think that the BLM would have graded the road "probably on the average of, I don't know, three out of four years.").  No third parties, including the County, have graded the road during this period of time.  See id. at 49, lines 2-5.

---

[17]Ray Petersen in his Rule 30(b)(6) deposition described the portion of the road in Section 2 that is located in the dugway as "steep and rocky and narrow," Exh. 17 at 48, line 9, and not passable "by standard clearance vehicle."  Id. at 47, lines 16-19.  He further testified that he did not drive the dugway when he undertook a site visit of the road because it "was closed" and the four-wheel drive Ford Bronco that he was in "may not have been the proper vehicle to get up and down there."  Id. at 48, lines 18-23; see also Exh. 25 (excerpts from Deposition of Burke Williams, BLM Richfield Field Office Resource Specialist, identified as a potential witness for the United States) at 19-22, lines 6-13 (describing this portion of the road as "very rough until you get to the bottom" (p. 22, lines 7-8) and further testifying, on his first visit there in 1977, he saw "a Suburban-type outfit that had went down into it and he get down in there just fine, but on the way back up it's very steep, it's rocky.  They ripped all four tires up right to the rim and it was sitting in the middle of the road and I seen tracks headed out through the desert walking back home or back to the freeway." (p. 21, lines 6-13)); id. at 46.  Consistent with the rough condition of the road at the dugway, the BLM has historically not maintained the road in or beyond the dugway.

## ANALYSIS

I.    **This Court Lacks Subject Matter Jurisdiction Over the Claim to the West Mexican Mountain Road Because There is No Case or Controversy to Adjudicate and No Disputed Interest in Title for Purposes of the QTA.**

    A.    **Lack of Case or Controversy.**

As discussed above, the U.S. Constitution requires the existence of a justiciable "case or controversy" as a condition to the exercise of subject matter jurisdiction over this action. Consistent with this requirement, the Court in <u>Washington County v. United States</u>, 903 F. Supp. 40, 41 (D. Utah 1995), determined that a Utah county seeking to quiet title to alleged R.S. 2477 rights-of-way on federal lands had failed to demonstrate a case or controversy where it had not alleged that the United States was interfering with or denying the existence of any rights claimed by the plaintiff. Specifically, the Court found the allegation that the United States "claims or may claim a right to deny plaintiff its right to construct and maintain rights-of-way, without more" was insufficient to "present a definite and concrete controversy." <u>Id.</u>

For similar reasons, this Court should determine that it lacks subject matter jurisdiction over Plaintiffs' claim to the West Mexican Mountain Road. In their Complaint, Plaintiffs allege as the primary basis of an alleged case or controversy over the Mexican Mountain Road that Defendants have closed the eastern end of the road. <u>See</u> Statement of Facts ("SOF") at ¶2.[18] However, Plaintiffs fail to allege any actions creating a conflict with respect to the West Mexican Mountain Road. In fact, and of critical importance, Plaintiffs admit in their discovery responses that, "aside from the

---

[18]Plaintiffs also rely upon the more generalized allegations of paragraphs 41 and 42 of the Complaint. <u>See</u> Complaint at ¶66 (referencing ¶¶41 and 42). Paragraphs 41 and 42 make reference to a vague threat of potential trespass citations for maintenance and construction activities proposed by the County but not approved by the BLM, as well as to the closure of certain of the claimed roads. These allegations do not establish a case or controversy as to the West Mexican Mountain Road, as they are squarely refuted by the more specific allegations in paragraph 66, Plaintiffs' discovery responses, and the 1980 MOU (as discussed below), all of which make clear that the dispute over the Mexican Mountain Road only concerns the closed portion at its east end. Moreover, the County is required to consult with the BLM when proposing road construction and improvements, regardless of whether it has previously established the existence of a valid R.S. 2477 right-of-way. <u>See</u> <u>S. Utah Wilderness Alliance v. BLM</u>, 425 F.3d at 748. The vague threat of possible interference with proposed unilateral construction activities therefore cannot establish a justiciable case or controversy.

27

Mexican Mountain eastern segment, the United States <u>has done nothing to interfere with the use,</u> <u>maintenance, or improvement</u> of the Mexican Mountain Road." <u>Id.</u> (emphasis added).  Finally, as discussed in more detail below, the BLM and Emery County expressly agreed in the 1980 MOU that the County is responsible for maintenance of the majority of the Mexican Mountain Road, but excluding the last several miles of the road starting at its eastern end in Section 3, T. 21 S., R. 13 E. <u>See</u> SOF at ¶12-13.  Accordingly, because it is undisputed that the United States has done nothing to interfere with the use, maintenance, or improvement of the West Mexican Mountain Road, the Court lacks jurisdiction over this portion of the claimed right-of-way for lack of case or controversy.

### B.     Lack of Disputed Title to Real Property Under the QTA.

For similar reasons, the Court lacks subject matter jurisdiction as to the claim for the West Mexican Mountain Road for failure to satisfy the conditions to the waiver of the United States' sovereign immunity under the QTA.  Before a district court can exercise jurisdiction under the QTA, the QTA requires as a condition to the United States' waiver of sovereign immunity that "(1) the United States must claim an interest in the property at issue, and (2) there must be a disputed title to real property." <u>Leisnoi</u>, 170 F.3d at 1191.  As with all waivers of the United States' sovereign immunity, courts have strictly applied this threshold requirement, dismissing cases where there was no present dispute or conflict in title.  For instance, in <u>Alaska v. United States</u>, 201 F.3d 1154, 1164-65 (9th Cir. 2000), the State of Alaska sought to quiet title to, among other property, the riverbed of the Black River.  The State argued that, based on the position the United States had taken on several similarly-situated rivers, the United States would dispute Alaska's claim to the riverbed of the Black River. The Ninth Circuit disagreed, and held that, even though the United States refused to either confirm or deny the State's claimed property right, there was no basis for a QTA claim because the United States had never actually disputed Alaska's claim as to that specific river (<u>id.</u> at 1165):

> The United States reserves the right to start a dispute, and has not disclaimed any interest. There may well be a dispute at some time, considering that the federal position on the Black simply followed the administrative determination on [other rivers], and it has taken conflicting positions on those rivers. But whatever dispute there may be, it has not yet occurred.

28

Here, the Court should likewise determine that it lacks subject matter jurisdiction over Plaintiffs' claim to the West Mexican Mountain Road, as Plaintiffs have even less reason to assert that the United States disputes their claimed title to this portion of the road.  As discussed above, Plaintiffs have only alleged facts sufficient to demonstrate a dispute over title to the East Mexican Mountain Road.  Plaintiffs have alleged no facts sufficient to demonstrate a title dispute as to the West Mexican Mountain Road and, in fact, have affirmatively admitted that the United States has done nothing to interfere with its use, maintenance, or improvement.  The BLM also expressly agreed in the 1980 MOU that Emery County had maintenance responsibility for the western end of the road.  The Court therefore lacks subject matter jurisdiction over this portion of the claim, as Plaintiffs cannot satisfy the condition to the waiver of the United States' sovereign immunity that the United States claim a title interest in the West Mexican Mountain Road.

II.     **Plaintiffs' Claims Are Barred by the QTA's Statute of Limitations as to the East Mexican Mountain, Sid's Leap, Copper Globe, and Seeger's Hole Roads.**

The Court lacks subject matter jurisdiction over Plaintiffs' claims to the East Mexican Mountain, Sid's Leap, Copper Globe, and Seeger's Hole Roads because Plaintiffs failed to bring these claims within the QTA's 12 year statute of limitations.  Plaintiffs filed this action on June 29, 2005.  The applicable date for purposes of the QTA's statute of limitations is therefore June 29, 1993.  As discussed in detail below, the indisputable facts demonstrate that Emery County "knew or should have known" – and the State had "notice" – well in advance of this date that the United States claimed an interest adverse to the alleged public highway rights-of-way claimed for each of these roads.  The indisputable facts further demonstrate that the United States or its lessee has "made substantial improvements or substantial investments" on the relevant lands or the United States has "conducted substantial activities pursuant to a management plan . . . or other similar activities" on these lands in satisfaction of the requirements of 28 U.S.C. § 2409a(i).  Accordingly, Plaintiffs' claims for each of these roads are time-barred and exceed the Court's subject matter jurisdiction.

A.      **Construction of QTA's Statute of Limitations.**

1.      **The Courts Construe the QTA's Statute of Limitations Narrowly and in**

29

**Favor of the United States.**

The federal courts have generally held that satisfaction of the QTA's statute of limitations, and therefore whether an action qualifies as one for which the United States has waived its sovereign immunity, is a jurisdictional prerequisite to a QTA action against the United States. See Block, 461 U.S. at 292; Fidelity Exploration and Prod. Co. v. United States, 506 F.3d 1182, 1185 (9th Cir. 2007). But see Wisconsin Valley Improvement Co. v. United States, 569 F.3d 331, 334 (7th Cir. 2009) (QTA's limitations period was a mandatory element of a QTA claim, rather than a prerequisite to jurisdiction). Since the QTA provides a statutory waiver of sovereign immunity, it is "subject to the rule that 'when Congress attaches conditions to legislation waiving the sovereign immunity of the United States, those conditions must be strictly observed, and exceptions thereto are not to be lightly implied.'" Fidelity, 506 F.3d at 1185-86 (quoting Block, 461 U.S. at 287); see also Mottaz, 476 U.S. at 841; United States v. Testan, 424 U.S. 392, 399 (1976). The courts have therefore construed the QTA and its statute of limitations narrowly and in favor of the sovereign. See Block, 461 U.S. at 275-76; Vincent Murphy Chevrolet Co., Inc. v. United States, 766 F.2d 449, 450-51 (10th Cir. 1985); Humboldt County v. United States, 684 F.2d 1276, 1280 (9th Cir. 1982).

> **2.     The Courts Use a Reasonableness Test in Determining When a County Plaintiff "Knew or Should Have Known" of the United States' Claim.**

For most claims, in determining "the date that the plaintiff or his predecessor in interest knew or should have known of the claim of the United States," 28 U.S.C. § 2409a(g), the courts utilize a reasonableness test. "The question is whether the United States' action would have alerted a reasonable landowner that the government claimed an interest in the land." Shultz v. Dep't of Army, 886 F.2d 1157, 1160 (9th Cir. 1989). "All that is necessary is a reasonable awareness that the Government claims some interest adverse to the plaintiff's." Knapp v. United States, 636 F.2d 279, 283 (10th Cir. 1980); see also California ex. rel., State Land Comm'n v. Yuba Goldfields, Inc., 752 F.2d 393, 397 (9th Cir. 1985); Amoco Prod. Co. v. United States, 619 F.2d 1383, 1388 (10th Cir. 1980); Vincent Murphy Chevrolet Co., Inc., 766 F.2d at 452; Park County, Mont. v. United States, 626 F.2d 718, 721 n.6 (9th Cir. 1980). Knowledge of the claim's full contours is not necessary, if

there is a reasonable awareness that the United States claims "some" interest adverse to the plaintiff. North Dakota ex rel. Bd. of Univ. v. Block, 789 F.2d 1308, 1313 (8th Cir. 1986); Knapp, 636 F.2d at 283. "The existence of one uncontroverted instance of notice suffices to trigger the limitations period." Nevada v. United States, 731 F.2d 633, 635 (9th Cir. 1984); see also Park County, 626 F.2d at 721 (single sign constitutes adequate notice). The statute of limitations cannot be tolled for claims against the United States. See United States v. Beggerly, 524 U.S. 38, 48 (1998).

The reasonable awareness standard is met when the plaintiff has any reason to understand that the United States claims an interest adverse to plaintiff's claimed interest. Constructive notice of a claim of the United States may be sufficient to commence the running of the statute of limitations. Yuba Goldfields, 752 F.2d at 396; Hawaii v. United States, 676 F. Supp. 1024, 1032 (D. Hawaii 1988), aff'd, 866 F.2d 313 (9th Cir. 1989). Accrual of a cause of action under the QTA does not require a showing of adversity, nor does it require that the United States' claim be communicated in clear and unambiguous language. Yuba Goldfields, 752 F.2d at 396 ("Constructive notice of recorded deeds may commence the running of the limitations period."). A plaintiff's cause of action for an easement across government land accrues when the government "'denie[s] or limit[s] the use of the roadway,'" Michel v. United States, 65 F.3d 130, 132 (9th Cir. 1995) (quoting Werner v. United States, 9 F.3d 1514, 1516 (11th Cir. 1993)), or plaintiff otherwise has reason to understand that the government claims "the exclusive right to deny . . . access." McFarland v. Norton, 425 F.3d 724, 727 (9th Cir. 2005), aff'd 545 F.3d 1106 (9th Cir. 2008), cert. denied, 129 S. Ct. 1582 (2009).

### 3. For State Claims, the QTA's Statute of Limitations is Triggered as of "the Date the State Received Notice of the Federal Claims to the Lands," Subject to Certain Additional Requirements.

The 1986 amendments to the QTA enacted a separate statute of limitations applicable to the states.[19] Rather than being triggered as of "the date that the plaintiff or his predecessor in interest

---

[19]New subsections 2409a(i) and (k) were added as part of the 1986 amendments to the QTA enacted as a legislative response to Block v. North Dakota in which the Supreme Court held that the QTA's 12 year statute of limitations, formerly set forth in 28 U.S.C. § 2409a(f) and now re-codified at section 2409a(g), was applicable to states. Block v. North Dakota, 461 U.S. at 292. See Pub. L. No.

knew or should have known of the claim of the United States," 28 U.S.C. § 2409a(g), the statute of limitations added by the 1986 amendments is triggered for most state claims as of the "the date the State received notice of the Federal claims to the lands."[20] 28 U.S.C. § 2409a(i).  In turn, the statute provides that "notice" shall be "(1) by public communications with respect to the claimed lands which are sufficiently specific as to be reasonably calculated to put the claimant on notice of the Federal claim to the lands, or (2) by the use, occupancy, or improvement of the claimed lands which, in the circumstances, is open and notorious."  28 U.S.C. § 2409a(k).  The statute further requires either: (1) that "the United States or its lessee or right-of-way or easement grantee have made substantial improvements or substantial investments" on the relevant lands; or (2) that the United States have "conducted substantial activities pursuant to a management plan such as range improvement, timber harvest, tree planting, mineral activities, farming, wildlife habitat improvement, or other similar activities" on these lands.  28 U.S.C. § 2409a(i).  Where these conditions are met, state claims are barred if an action is not commenced within 12 years after the State first received notice of the United States' claim.

Notwithstanding the differences in the statutes of limitation applicable to county and state claims, the courts have on several occasions determined that federal action sufficient to bar County claims under 28 U.S.C. § 2409a(g) would likewise satisfy the statute of limitations applicable to states.  For instance, in Calhoun County, Tex. v. United States, 132 F.3d 1100, 1103 (5th Cir. 1998), the Fifth Circuit found that, even if the county were treated as a state, the lands were subject to the QTA's limitations period as it applies to states because the United States had conducted activities to improve the wildlife habitat on the Matagorda Island on which the county claimed public roads.  Likewise, in Millard County v. United States ("Millard County"), this Court determined that,

99-598, 100 Stat. 3351 (1986).  Former Section 2409a(f) was re-codified as Section 2409a(g) in 1986.  See Pub. L. No. 99-598, 100 Stat. 3351 (1986).

[20] The QTA includes different statute of limitations provisions for state claims for "defense facilities" or "submerged lands."  See 28 U.S.C. §§ 2409a(h), (j).

regardless of whether the statute of limitations under 28 U.S.C. § 2409a(g) or 28 U.S.C. § 2409a(i) and (k) applied to the county, the county's claim for an R.S. 2477 right-of-way was barred where the BLM, among other things, had graded a portion of the claimed road more than 12 years before the action was filed. Millard County, No. 93-C-591J, at 8-10 (D. Utah Dec. 4, 1995) (Memorandum Decision) (J. Jenkins), attached as Exh. 26. This Court specifically determined that the road grading was a "substantial improvement" of the road that satisfied sections 2409a(i) and (k) of the QTA. Id. Accordingly, actions sufficient to trigger the statute of limitations under 28 U.S.C. § 2409a(g) may also trigger the State statute of limitations under 28 U.S.C. § 2409a(i) and (k).

      **B.    East Mexican Mountain Road.**

      In accordance with the foregoing standards, Plaintiffs' claim to the East Mexican Mountain Road is barred by the statute of limitations because Plaintiffs have long had notice of the United States' adverse claim to this portion of the claim through numerous federal actions, and "the United States or its lessee have made substantial improvements or substantial investments" on the relevant lands. See 28 U.S.C. § 2409a(i). First, the United States triggered the statute of limitations in 1975 by exercising exclusive jurisdiction and control over the East Mexican Mountain Road in connection with its construction to enable access by an oil and gas company to a proposed oil and gas well. Second, the BLM again triggered the statute of limitations by omitting any reference to the East Mexican Mountain Road in the 1980 MOU, which assigned maintenance responsibility between the BLM and the County as to roads located in the County and indicated that the roads for which the County assumed maintenance responsibility constituted all of the roads for which the County asserted R.S. 2477 rights-of-way. Third, the statute of limitations was triggered by the inclusion of the East Mexican Mountain Road in the Mexican Mountain WSA in 1980. Fourth, the statute of limitations was again triggered in the mid-1980s when the BLM issued a trespass citation to the County for unauthorized road improvements that the County completed to the road. The County subsequently reclaimed the unauthorized road improvements, and barricades were constructed to preclude future motor vehicle use on this portion of the road. Fifth and finally, the BLM triggered

the statute of limitations in 1989 and again in 1991 through the issuance of the 1989 FEIS and the 1991 Plan, which prohibited OHV use in the area containing the East Mexican Mountain Road.

    **1.**    **The United States Triggered the Statute of Limitations in 1975 as to the East Mexican Mountain Road by Exercising Exclusive Jurisdiction and Control Over the Road and Overseeing its Construction.**

The United States first triggered the statute of limitations as to the East Mexican Mountain Road in 1975 in connection with Wainoco's application for permit to drill an oil and gas well at what is now the eastern end of the claimed Mexican Mountain Road.  In connection with that application, the USGS and BLM exercised exclusive jurisdiction and control over the East Mexican Mountain Road and authorized and oversaw its construction.  See SOF at ¶¶3-9.  The USGS and BLM also provided notice that they did not consider the East Mexican Mountain Road to have been in existence prior to its construction in connection with the 1975 project, see id. at ¶¶4-5, 7-8, and, of critical importance, exercised authority to determine whether to keep the newly constructed road open or closed after the well was plugged and abandoned.  See id. at ¶¶5, 8-9.  These activities triggered the statute of limitations as to the County because they were more than sufficient to create a "reasonable awareness that the Government claims some interest adverse to the plaintiff's." Knapp, 636 F.2d at 283.  Likewise, these activities provided the requisite "notice" to the State because the road improvement and construction activities constituted "the use, occupancy, or improvement of the claimed lands, which, in the circumstances, is open and notorious." 28 U.S.C. § 2409a(k).  In fact, the State appears to have had actual notice of these activities, as one of the files cited by Defendants appears to be a copy of a Utah Division of Oil, Gas, and Mining file.  See SOF at ¶3.  Finally, the improvement of the existing road and construction of the new road constituted "substantial improvements" completed by the United States or its lessee under 28 U.S.C. § 2409a(i).

On similar facts, this Court confirmed the applicability of the QTA's statute of limitations in Millard County.  There, this Court ruled that the statute of limitations had run on the county's claim to an R.S. 2477 right-of-way, even if the county were treated as a state for purposes of the QTA, where the BLM graded a portion of the claimed road.  See Millard County at 8-10.  According

to this Court, the road grading satisfied the notice requirements of the statute of limitations because "the fact of construction, which was open and notorious under the circumstances, was at least sufficient to put the County on inquiry notice . . . ." Id. at 10.  The Court also determined that the grading constituted "substantial improvements" under section 2409a(i) and (k).  See id.  Finally, the Court relied upon the fact that American Quasar Petroleum had "applied for a right-of-way permit from the BLM to access a proposed oil and gas exploration well," which right-of-way was located along the claimed R.S. 2477 right-of-way.[21/]  Id. at 6.  The Court determined that the permit application provided an additional statute of limitations trigger:

> American Quasar's 1980 application to the BLM for a right-of-way permit, which the County admits it knew of, put the County on notice not only that the United States claimed an interest in the road but also that the United States claimed the right to restrict and regulate access to and use of the road.  See Nevada, 731 F .2d at 635 ("merely asserting some federal authority over a backroad" is "sufficient for § 2409a(f) [now 2409a(g)] notice purposes") (citing Park County, 626 F.2d at 720-21).

Id. at 11 (emphasis added).  For similar reasons, the United States' exercise of exclusive authority and control over the East Mexican Mountain Road in connection with Wainoco's permit application triggered the statute of limitations as to the road in 1975.

### 2.    The BLM Again Triggered the Statute of Limitations as to the County's Claim for the East Mexican Mountain Road Through the 1980 MOU.

On November 5, 1980, the BLM again triggered the statute of limitations as to the County's claim to the East Mexican Mountain Road by executing the 1980 MOU.  By its express terms, the 1980 MOU states: "the County agrees that the roads shown and listed in Attachments A and B are all of the roads indicated under RS 2477 (43 U.S.C. 932) as of October 21, 1976."  SOF at ¶12 (quoting 1980 MOU (EC0006047)).  The MOU only identifies the western 11.0 miles of the claimed road as under the County's maintenance responsibility.  See SOF at ¶¶13-14.  The East Mexican Mountain Road is not depicted or in any way described in the attachments to the MOU.  See id. at

---

[21/]As discussed below, the Court also relied upon the fact that a MOU between the County and the BLM concerning the parties' respective responsibilities for road construction and maintenance identified the claimed road as a "B.L.M. Road."  Millard County at 4, 11.

¶14.  The omission of the East Mexican Mountain Road from the MOU – as contrasted with the express inclusion of the West Mexican Mountain Road – indicates that neither of the parties then considered this portion of the claimed road to qualify as a potential R.S. 2477 right-of-way.  In these circumstances, this omission was sufficient to provide the County with "a reasonable awareness that the Government claims some interest adverse to the plaintiff's." Knapp, 636 F.2d at 283.  Indeed, this omission appears deliberate, given that the 1980 MOU was executed at roughly the same time as the BLM's decision to keep the road closed following a significant natural washout at the location of the road's present barricade, see SOF at ¶15, and a mere five years after the BLM exercised exclusive jurisdiction over the East Mexican Mountain Road in connection with the Wainoco permit application.  Accordingly, the 1980 MOU serves as a second trigger for the statute of limitations in 1980 as to the County's claims.[22]  Compare Millard County at 11 (1970 MOU "between the Millard County Commission and the BLM, with its attachments identifying the Kings Way Road as a 'B.L.M. Road,' put the County on notice that the United States claimed title to the road.").

###	3.	The BLM Again Triggered the Statute of Limitations Through its Designation of the Mexican Mountain Wilderness Study Area in 1980.

The United States again triggered the statute of limitations in 1980 by including the lands underlying the East Mexican Mountain Road in the Mexican Mountain WSA and notifying the public at large – including Emery County and the State – of the designation through a Federal Register notice published on November 14, 1980.  See SOF at ¶15.  Two district court opinions confirm that the designation of a WSA commences the running of the statute of limitations as to R.S. 2477 claims located in the WSA – albeit for different reasons.  First, the court in Southwest Four Wheel Drive Ass'n v. BLM, 271 F. Supp. 2d 1308, 1312 (D.N.M. 2003), aff'd on other grounds, 363 F. 3d 1069 (10th Cir. 2004), ruled that the designation of a WSA encompassing claimed R.S. 2477 rights-of-way triggered the statute of limitations as of the date of the Federal Register publication

---

[22]The BLM has not yet determined when the State received "notice" of the 1980 MOU.  However, even if the State did not receive notice until after June 29, 1993, the MOU would still preclude its claim for the East Mexican Mountain Road for the reasons discussed in Section III, below.

of the WSA designation because the publication provides notice "that BLM claimed all of the area and did not recognize any alleged rights-of-way." As the United States argued in that case, such publication provides the date by which "Plaintiffs knew or should have known . . . that the United States claimed there were no 'public roads' within the" WSA because "a WSA designation means the United States asserts that the area is roadless." Sw. Four Wheel Drive, 271 F. Supp. 2d at 1311.

Second, in an alternate line of reasoning, the district court in County of Inyo v. U.S. Dep't of Interior, Case No. CV F-06-1502 AWI DLB, 2008 WL 4468747, at *9-11 (E.D. Cal. Sept. 29, 2008), concluded that a WSA designation triggered the QTA's statute of limitations because the designation limited plaintiff Inyo County's ability to enhance or upgrade its claimed rights-of-way for four dirt roads.[23] In so ruling, the court rejected the analysis in Southwest Four Wheel Drive, reasoning that classification of an area as "roadless" is not sufficient in and of itself to start the running of the statute of limitations because such classification does not necessarily preclude any desired use or improvement of the claimed rights-of-way. County of Inyo, at *9. The court nonetheless reached the same result as the earlier opinion on the basis that the "BLM's duty under FLPMA to prevent degradation of existing wilderness values resulted in an impairment of Plaintiff's ability to enhance or up-grade any of its rights of way for a period of about 12 years." Id. at *11; but see Millard County at 9-10 n.9 (designation of area as WSA did not necessarily trigger running of statute of limitations, "especially given County's belief that mechanical improvement or construction of a road was not necessary to establish an R.S. 2477 right-of-way in Utah.").

By these same two rationale, the inclusion of the East Mexican Mountain Road in the Mexican Mountain WSA was sufficient to trigger the statute of limitations. As the court in Southwest Four Wheel Drive ruled, the designation provided notice that the BLM regarded the area as "roadless." Alternately, as the court in County of Inyo ruled, the designation had the effect of

---

[23] The designation of the Mexican Mountain WSA had this very effect in the present case, as the BLM cited to the Interim Management Policy governing the management of WSAs as one of the reasons it required the County to reclaim the unauthorized improvements that it made in 1984 to the portion of the Mexican Mountain Road located in the WSA. See SOF at ¶17.

impairing the Plaintiffs' ability to improve this portion of the claimed right-of-way as a result of FLPMA's mandate that the BLM "prevent degradation of existing wilderness values" in the WSA. County of Inyo at *11.  Under either line of reasoning, the WSA designation was sufficient to make the County reasonably aware – and to provide the State with "notice" – of the United States' claim, as the publication of the designation in the Federal Register both apprised the County of the claim and qualifies as a "public communication[] with respect to the claimed lands which [is] sufficiently specific as to be reasonably calculated to put the [State] on notice."  28 U.S.C. § 2409a(k); see also Friends of Sierra R.R., Inc. v. I.C.C., 881 F.2d 663, 667-68 (9th Cir. 1989) ("Publication in the Federal Register is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance.").  Moreover, with respect to the State's claim, the road construction activities completed in 1975, as discussed above, and the reclamation activities undertaken to the east end of the road in the mid-1980s, as discussed below, constituted "substantial improvements" within the meaning of 28 U.S.C. § 2409a(i).  Accordingly, for all these reasons, the 1980 WSA designation again triggered the statute of limitations as to the East Mexican Mountain Road as of the November 14, 1980 Federal Register publication date and resulted in the running of the statute on November 14, 1992 – long before Plaintiffs filed this action in 2005.

4. **The BLM Again Triggered the Statute of Limitations By Issuing a Trespass Citation to the County in 1984 for Unauthorized Improvements on the East Mexican Mountain Road and Subsequently Requiring Reclamation of the Improvements and Closure of the Road.**

The BLM again triggered the statute of limitations in the mid-1980s in connection with the November 28, 1984 trespass citation that it issued to the County for the unauthorized improvements that the County performed on the East Mexican Mountain Road.  By issuing the citation to the County for the unauthorized improvements, requiring the County to reclaim the improvements, and subsequently overseeing the County's placement of "large boulders near the end of the cherrystem in the roadbed to prevent vehicular access," see SOF at ¶¶16-22 (quoting Exh. 10 at EC00006461), the BLM asserted exclusive jurisdiction and control over the road and undertook action that was more than sufficient to make the County reasonably aware of its claim.  See Michel, 65 F.3d at 132

(a plaintiff's cause of action for an easement across government land accrues when the government "'denie[s] or limit[s] the use of the roadway'") (citation omitted).  In fact, the County expressly documented its awareness of the BLM's adverse claim in its November 12, 1986 letter in which it registered its opposition and protest to the road closure.  See SOF at ¶22.

Likewise, the trespass citation and subsequent reclamation and closure activities triggered the statute of limitations as to the State.  These events provided the requisite "notice" to the State of the United States' adverse claim because the reclamation and closure of the road constituted the "use, occupancy, or improvement of the claimed lands which, in the circumstances, is open and notorious."  28 U.S.C. § 2409a(k); see also Millard County at 10.  In addition, by requiring the reclamation and closure of the road, posting a sign evidencing the road closure, seeding the reclaimed road, and periodically inspecting the road to monitor the effectiveness of the reclamation activities, see SOF at ¶¶19-23, the BLM undertook actions constituting "substantial improvements or substantial investments or . . . substantial activities pursuant to a management plan such as range improvement, timber harvest, tree planting, mineral activities, farming, wildlife habitat improvement, or other similar activities."  28 U.S.C. § 2409a(i).  Indeed, these reclamation and closure activities significantly infringed on Plaintiffs' alleged rights and were at least as extensive as the road grading activities that the Court deemed sufficient to constitute "substantial improvements" in Millard County.  Millard County at 10.  Accordingly, the BLM again triggered the statute of limitations as to the East Mexican Mountain Road in November 1984 when it sent the trespass citation to the County and thereafter through the subsequent reclamation and closure activities that it required in connection with the citation.

### 5.  The BLM Again Triggered the Statue of Limitations Through its Issuance of the 1989 FEIS and 1991 Plan.

The BLM again triggered the statute of limitations as to the East Mexican Mountain Road by issuing the 1989 FEIS and the 1991 Plan.  See SOF at ¶24.  In the 1989 FEIS, the BLM proposed closing the San Rafael Canyon ACEC (Lower Portion) to "ORV use."  See SOF at ¶28.  This ACEC contains the vast majority of the East Mexican Mountain Road.  See id. at ¶26.  On May 24, 1991,

39

the BLM approved this proposed closure by issuing the 1991 Plan. <u>See</u> SOF at ¶¶24-25. This decision formally closed the East Mexican Mountain Road to all motor vehicle use. In this regard, the Plan distinguished between five potential classifications by which the lands covered by the Plan could be managed for ORV use – (1) open to ORV use; (2) open with seasonal restrictions; (3) limited to existing roads and trails; (4) limited to designated roads and trails; and (5) closed to ORV use. <u>See</u> SOF at ¶25. The Plan also indicated that the ORV designations applied both to recreational and non-recreational uses. <u>See</u> SOF at ¶27. By approving the most restrictive classification – "closed to ORV use" – for the San Rafael Canyon ACEC (Lower Portion), the BLM prohibited all motor vehicle use in this area, whether on or off designated or existing roads and trails, and thereby prohibited motor vehicle on the East Mexican Mountain Road.

Significantly, the BLM specifically considered the Mexican Mountain Road in the 1989 FEIS, stating that this road might be considered for a right-of-way grant through a process completed in accordance with NEPA, but only if "it is determined necessary for public safety (i.e., access for river rescue operations, etc.)." SOF at ¶28 (quoting Exh. 12 at EC00002325). However, unless such a right-of-way were subsequently authorized or confirmed independently of the Plan through this or other appropriate process, the East Mexican Mountain Road was to remain closed in accordance with the provisions of the approved Plan.

Finally, because the Plan was subject to public notice and comment, <u>see</u> SOF at ¶24, its approval provided the requisite notice to both the County and the State of the United States' adverse claim to the East Mexican Mountain Road and its claimed authority to deny motor vehicle use on this portion of the road. In fact, the BLM's publication of notice of the FEIS in the Federal Register on August 31, 1989, <u>see id.</u>, triggered the statute of limitations in 1989, even before the Plan was finally approved, because the BLM in the FEIS specifically proposed closing the area containing the East Mexican Mountain Road to ORV use. <u>See</u> SOF at ¶28. When coupled with the "substantial improvements" to the road discussed in the preceding sections, the 1989 FEIS and the 1991 Plan therefore serve as two additional triggers for the statute of limitations as to both the County's and

State's claim.  Accordingly, for all these reasons, the QTA's 12 year statute of limitations as to the East Mexican Mountain Road was initially triggered in 1976 in connection with the Wainoco well permit application, again in 1980 in connection with the 1980 MOU and the 1980 WSA designation, yet again in the mid-1980s through the 1984 trespass citation and subsequent reclamation and closure activities, and finally in 1989 and 1991 through the issuance of the 1989 FEIS and 1991 Plan.  Plaintiffs' claim to this portion of the Mexican Mountain Road was therefore time-barred long before they filed this action in 2005.

        **C.**      **Sid's Leap Road.**

Plaintiffs' claim to the Sid's Leap Road is barred by the statute of limitations because: (1) the BLM constructed approximately the first mile of the road in connection with a range improvement project in 1961; (2) the United States included the eastern end of the road in the Mexican Mountain WSA in 1980; and (3) the BLM designated the area containing the eastern end of the road as closed to OHV use in the 1991 Plan and subsequently signed the area as closed to motor vehicle travel.  While "one uncontroverted instance of notice" would have been sufficient to trigger the QTA's statute of limitation, see Nevada v. United States, 731 F.2d at 635, here there were a myriad of actions by the BLM that put Plaintiffs on notice of the United States' claim and resulted in the preclusion of these claims long before Plaintiffs filed this action in 2005.

        **1.**      **The BLM Triggered the Statute of Limitations By Constructing Approximately the First Mile of the Sid's Leap Road in 1961 as a Range Improvement Project.**

The BLM first triggered the statute of limitations for the Sid's Leap Road when it authorized and completed a range improvement project for the so-called "East Johnny's Fork Road" in 1961.  See SOF at ¶¶30-33.  Through this project, the BLM asserted exclusive ownership and control over the Sid's Leap Road by constructing approximately its first mile at the southern and western end of the road and assuming maintenance responsibility for the road.  See id. at ¶¶30-32.  Federal funds also appear to have been used exclusively on the project, and area range users contributed no funds to its completion.  See id. at ¶31.

As with the road grading project in <u>Millard County</u>, these facts were sufficient to put the County and State on notice of the BLM's claim, as the construction "was open and notorious under the circumstances." <u>Millard County</u> at 10. Likewise, as in <u>Millard County</u>, the road construction constitutes "substantial improvements or substantial investments" by the United States or its lessee under 28 U.S.C. § 2409a(i), as the project was undertaken by the BLM and appears to have been funded by federal funds.[24] Finally, as in <u>Millard County</u>, the BLM's construction of approximately the first mile of the Sid's Leap Road is sufficient to bar Plaintiffs' claim to the entire road. <u>See Millard County</u> at 10-11. As the Court in <u>Millard County</u> explained:

> The fact that the BLM did not grade the entire length of the road does not negate the fact that the County had at least inquiry notice of the United States' claim to the entire road. <u>See</u> Knapp, 636 F.3d at 283 (the [QTA's] statute of limitations does not require that the plaintiff have knowledge of the full contours of the United States' claim; "[a]ll that is necessary is a reasonable awareness that the Government claims some interest adverse to plaintiff's."). <u>Cf.</u> Park County v. United States, 626 F.2d 718, 720-21 & n.6 (9th Cir. 1980) (a sign marking the entrance to a federal primitive area, placed some distance from the beginning of a road and over forty miles away from the county seat, put the county on notice that the United States claimed control over at least a substantial portion of the right-of-way and would have alerted the county to make reasonable inquiry as to the rest of the right-of-way), <u>cert.</u> denied, 449 U.S. 1112 (1981).

<u>Millard County</u> at 10-11. Accordingly, the East Johnny's Fork range improvement project triggered the statute of limitations in 1961 and barred Plaintiffs' claim to the Sid's Leap Road as of 1973.

### 2.    The BLM Triggered the Statute of Limitations in 1980 Through the Designation of the Mexican Mountain WSA.

The BLM again triggered the statute of limitations in 1980 by providing notice of the designation of the Mexican Mountain WSA in the Federal Register on November 14, 1980. The lands comprising the Mexican Mountain WSA underlie approximately the eastern-most 2.28 miles of the claimed Sid's Leap Road. <u>See</u> SOF at ¶36. Therefore, as with the East Mexican Mountain

---

[24]Prior to the 1986 amendments to the QTA, the State's claims were subject to the same statute of limitations as the County's claims. <u>See</u> <u>Block v. North Dakota</u>, 461 U.S. at 292. Therefore, the 12 year statute of limitations would have run as to both the County and the State's claims for the Sid's Leap Road in 1973 under the "knew or should have known" standard, even if the road construction project were somehow deemed not to qualify as "substantial improvements."

Road, the designation of the Mexican Mountain WSA in 1980 triggered the statute of limitations as to the Sid's Leap Road, both by providing the County and State with notice that the BLM regarded these lands as roadless and by impairing Plaintiffs' ability to improve this portion of the road. See Sw. Four Wheel Drive, 271 F. Supp. 2d at 1311; County of Inyo, 2008 WL 4468747, at *11. Moreover, as to the State's claim, the BLM satisfied the "substantial improvements or substantial investments" prong of 28 U.S.C. § 2409a(i) through its prior construction of the East Johnny's Fork Road at the west end of the road. Accordingly, the designation of the Mexican Mountain WSA in 1980 evidenced a continuing assertion of control over the Sid's Leap Road by the BLM and served as an additional trigger for the statute of limitations on Plaintiffs' claim for this road.[25]

> ### 3. The BLM Triggered the Statute of Limitations By Issuing the 1989 FEIS, Approving the 1991 Plan, and Subsequently Managing the Sid's Leap Road to Implement the Plan's Closure of its East End.

Finally, the BLM again triggered the statute of limitations on the Sid's Leap Road claim in 1989 and again in 1991 by issuing the 1989 FEIS and the 1991 Plan. As discussed above, the BLM proposed closing the San Rafael Canyon ACEC (Lower Portion) to ORV use in the 1989 FEIS and subsequently approved this proposed closure in the 1991 Plan. The boundary of the lands included in this ACEC in the vicinity of the claimed Sid's Leap Road includes and extends beyond the boundary of the Mexican Mountain WSA, and the ACEC includes approximately the eastern-most 2.75 miles of the claimed road. See SOF at ¶37. Moreover, in furtherance of the closure approved in the Plan, the BLM on August 24, 1993 subsequently "installed 8 carsonite or metal signs within [the] WSA/ACEC, along the road to [Sid's] Leap." See SOF at ¶38 (quoting Exh. 18 at EC00006394). On a map attached to the staff report prepared in connection with the sign postings, these signs are described as "WSA/no vehicle signs" and are shown by hand-drawn notation as being

---

[25] It also bears noting that the 1980 MOU altogether fails to identify the Sid's Leap Road in Attachments A and B and lists the BLM road that provides the sole access to the Sid's Leap Road (the Sinkhole-Jackass Bench Loop road) as under the BLM's maintenance responsibility. See SOF at ¶¶34-35. These facts further suggest that the County was aware of the adverse claim of the United States to the Sid's Leap Road as of 1980 and certainly establish that the County did not allege the existence of an R.S. 2477 right-of-way for the road at that time.

located along approximately the last several miles of the claimed Sid's Leap road as it approaches

an area known as "Swazys [sic] Leap."  See SOF at ¶38 (quoting Exh. 18 at EC00006395).

By these actions, the BLM again triggered the statute of limitations as to the Sid's Leap Road

by proposing the closure of its east end in the 1989 FEIS, approving the proposed closure in the 1991

Plan, and subsequently posting road closure signs in implementation of the 1991 closure decision.

These actions were sufficient to render the County reasonably aware of the BLM's adverse claim to

the entirety of the road and to provide the State with the requisite "notice" of the claim through the

public notice and comment procedures provided in connection with the Plan.  See SOF at ¶24; see

also Park County, 626 F.2d at 720-21 (notice as to portion of claim is sufficient as to the entire

purported right-of-way); Millard County at 10 (notice as to portion of claim is sufficient because

QTA's statute of limitations does not require that the plaintiff have knowledge of the full contours

of the United States' claim).  As to the State's claim, the posting of the road closure signs pursuant

to the 1991 Plan also constituted "substantial investments" and "substantial activities pursuant to a

management plan" – and the BLM's prior construction of the beginning of the road in 1961

constituted "substantial improvements or substantial improvements . . . or other similar activities"

– within the meaning of 28 U.S.C. § 2409a(i).  Accordingly, these actions again triggered the statute

of limitations as to Sid's Leap Road as of the publication of the FEIS on August 31, 1989 and again

as of the approval date of the Plan on May 24, 1991 and resulted in the running of the statute on

August 31, 2001 and again on May 24, 2003 – several years before Plaintiffs filed this action.  For

all these reasons, Plaintiffs' claim to the Sid's Leap Road is time-barred.[26]

    D.    **Plaintiffs' Claim to the Copper Globe Road is Barred by the Statute of Limitations by Virtue of the 1971 and 1980 MOUs, the State's Grant of an**

---

[26]The posting of the road signs on August 24, 1993 occurred approximately 11 years, 10 months before this action was filed on June 29, 2005 and therefore did not satisfy the QTA's 12 year statute of limitations.  However, by posting the "no vehicle" signs in implementation of the 1991 closure decision, the BLM confirmed that the closure of the ACEC to "ORV use" prohibited all motor vehicle use on that portion of the Sid's Leap Road included in the ACEC.  The postings were also sufficient to satisfy the seven year bar applicable to the State's claims under Utah Code Ann. § 78B-2-201 (discussed in Section IV., below).

**Exclusive Easement to the BLM for a Portion of the Road in 1985, and Subsequent Road Work Completed by the BLM.**

Plaintiffs' claim for the Copper Globe Road is precluded by the statute of limitations because: (1) the BLM has long asserted ownership of the road, dating back to at least 1963, and was assigned maintenance responsibility for the road through the 1971 and 1980 MOUs with the County; (2) the State of Utah in 1985 granted the BLM an "exclusive" easement for the portion of the claimed road located over State lands; and (3) the BLM has periodically expended resources on maintaining and improving the road. These undisputed facts establish that Plaintiffs' claim for the Copper Globe Road has long been barred by the QTA's statute of limitations.

The BLM has asserted ownership over the Copper Globe Road since at least 1963 when it listed the road as its maintenance responsibility in a BLM recreation inventory, see SOF at ¶40, and the County has known of the BLM's claim since at least the execution of the 1971 MOU and subsequently the 1980 MOU assigning maintenance responsibility for the road to the BLM. See SOF at ¶¶41-45. In fact, by agreeing in the 1980 MOU that the Copper Globe Road (a/k/a Justensen Flat-Kimball Wash Road) was under the maintenance responsibility of the BLM, the County acknowledged the BLM's authority over the road and conceded that it did not consider the road to qualify for the assertion of an R.S. 2477 right-of-way. See SOF at ¶12 (quoting Exh. 7 at EC00006047) ("With regards to public land, the County agrees that the roads shown and listed in Attachments A and B are all of the roads indicated under RS 2477 (43 U.S.C. § 932) as of October 21, 1976 . . . .") (emphasis added); see also Millard County at 11 (MOU between County and BLM identifying claimed road "as a 'B.L.M. Road,' put the County on notice that the United States claimed title to the road."). Significantly, Plaintiffs' own 30(b)(6) witness identified the road as a BLM road. See SOF at ¶45. Accordingly, the County "knew or should have known" of the BLM's claim since at least 1971 and certainly no later than 1980. 28 U.S.C. § 2409a(g).

With respect to the State's claim, the State has had "notice" of the BLM's claim since at least February 26, 1985, when the BLM sent to the State an appraisal report on a proposed easement that the BLM sought for that portion of the Copper Globe Road that is located over State lands. See SOF

at ¶¶46-47.  On August 8, 1995, the State granted the BLM an "exclusive" easement for this portion

of the claimed Copper Globe Road, and the easement was subsequently recorded in Emery County

on September 26, 1985.[27]  See id. at ¶¶46-48.  These actions, including particularly the letter from

the BLM to the State, qualify as "public communications with respect to the claimed lands which

are sufficiently specific as to be reasonably calculated to put the claimant on notice of the Federal

claim to the lands."  28 U.S.C. § 2409a(k).  Through the letter, the BLM asserted ownership and

control over the Copper Globe Road by requesting an easement for those limited portions of the road

that are located on State lands, and the State subsequently acknowledged this ownership and control

by granting the BLM "an exclusive easement to locate, construct, use, maintain, improve, relocate,

and repair a road over and across" these lands.  SOF at ¶46 (quoting Exh. 23 at EC00005386).  It

would have wholly defied reason for the State to have granted the BLM an exclusive easement for

the portions of the road located over the State lands, if the State had simultaneously asserted that it

held a R.S. 2477 right-of-way for those adjoining portions of the road located over BLM lands.

      The BLM has also undertaken "substantial improvements," "substantial investments," or

"other similar activities" in connection with the Copper Globe Road within the meaning of 28 U.S.C.

§ 2409a(i) through the extensive road grading and construction activities that it performed over the

entire length of the road in 1992 and again in 1995.  See SOF at ¶¶46-47.  As in Millard County, the

1992 blading was also sufficient again to put the County and State on notice of the BLM's claim

more than 12 years before this action was filed in 2005, as the blading was "open and notorious

under the circumstances."[28]  Millard County at 10.  Accordingly, for all these reasons, the QTA's

statute of limitations bars Plaintiffs' claim to the Copper Globe Road.  The statute was triggered as

_____

[27]The recording of the easement also again triggered the statute of limitations as to the County in
1985 by providing constructive notice to the County.  See Yuba Goldfields, 752 F.2d at 396.

[28]The 1995 road improvement activities did not occur 12 years or more before the filing of action,
but they still qualify as "substantial improvements or substantial investments . . . or other similar
activities" under 28 U.S.C. § 2409a(i).  These activities also satisfy the seven year bar applicable to
the State's claims under Utah Code Ann. § 78B-2-201 (discussed in Section IV, below).

to the County in 1971 and in 1980 through execution of the MOUs and again in 1985 by the recording of the exclusive easement.  The statute was triggered as to the State in 1985 through the easement and again in 1992 through the BLM's subsequent blading of the entire road.  The statute had therefore run long before Plaintiffs filed this action in 2005.

### E.   Plaintiffs' Claim to the Seeger's Hole Road is Barred by the Statute of Limitations by Virtue of the 1971 MOU and Subsequent Road Grading Performed by the BLM on a Recurring Basis on the Upper Seeger's Hole Road.

Plaintiffs' claim for the Seeger's Hole Road is barred by statute of limitations because the BLM was assigned maintenance responsibility for the Upper Seeger's Hole Road in its 1971 MOU with the County, and the BLM has exclusively graded this portion of the road on an annual or near annual basis since at least 1978.  See SOF at ¶¶52, 55.  By virtue of these facts, the County "knew or should have known" of the BLM's adverse claim.  28 U.S.C. § 2409a(g); see also Millard County at 10-11 (statute of limitations triggered where the BLM graded portions of the road, and the road was identified in MOU with the County as a BLM road).  In fact, Ray Petersen in his Rule (30)(b)(6) deposition acknowledged that the County considers the west end of the road to be a "BLM system road."  SOF at ¶54.  Accordingly, the statute of limitations as to the County's claim was first triggered in 1971 and first ran 12 years later in 1983 and was subsequently triggered starting no later than 1978 by virtue of the BLM's annual or near annual grading of the Upper Seeger's Hole Road.

Likewise, this recurring road grading satisfied the statute of limitations as to the State.  First, as in Millard County, this road work provided the requisite "notice" to the State, as it was "open and notorious" under the circumstances.  Millard County at 10; 28 U.S.C. § 2409a(k).  Second, this work constituted "substantial improvements," "substantial investments," or "other similar activities" in satisfaction of 28 U.S.C. § 2409a(i).  Indeed, the BLM's exclusive grading of the road on an annual or near annual basis over a period in excess of 30 years constitutes "substantial improvements" under Millard County and further qualifies as "substantial investments" of labor, resources, and equipment.  See Millard County at 10.  Finally, as in Millard County, the BLM's grading of approximately the first six miles of the claimed road, see SOF at ¶¶52, 55, or approximately one-half of the claimed

road, was sufficient to apprise Plaintiffs of the entirety of the BLM's claim, particularly given that the graded portion provides the only motor vehicle access to those portions of the claimed road located below and to the east of the dugway in Section 2.  See SOF at ¶53; Millard County at 10. Accordingly, the statute of limitations was triggered as to the County's claim to the Seeger's Hole Road through the execution of the 1971 MOU and as to both the State and the County's claim no later than 1978 through the recurring maintenance of the road undertaken by the BLM.  The claim was therefore barred long before Plaintiffs filed this action in 2005.

**III.    The State's Claims to the East Mexican Mountain, Sid's Leap, Copper Globe, and Seeger's Hole Road are Barred Because the State did not Acquire a Purported Interest in these Rights-of-Way Under Utah's Legislative Scheme Until After the County's Claims Were Barred by the Statute of Limitations.**

In the alternative, to the extent the Court were to determine that the statute of limitations had run on the County's claims but not the State's claims to the East Mexican Mountain, Sid's Leap, Copper Globe, and Seeger's Hole roads, the State would nonetheless be precluded from bringing these claims by virtue of Utah's legislative scheme.  This legislative scheme did not purport to vest the State with an interest in the R.S. 2477 rights-of-way claimed for these roads until 1993 at the earliest and likely not until 2000 – well after the County had been precluded from bringing a QTA claim under 28 U.S.C. § 2409a(g).

**A.    Under Utah's Legislative Scheme, the State's Purported Interest in these Rights-of-Way is Derivative of and Subject to the Same Limitations as the County's.**

Utah Code Ann. §§ 72-5-302(2) and 72-5-103(2)(b) purportedly vest the State with an interest in R.S. 2477 rights-of-way and county roads, respectively.  Plaintiffs expressly cite Utah Code Ann. § 72-5-302(2) in alleging that "[t]he State and Emery County are joint owners of the R.S. 2477 rights-of-way in Emery County."  Complaint at ¶6.  Section 72-5-302(2) provides that the state and its political subdivisions have title to R.S. 2477 rights-of-way in accordance with referenced statutes addressing each road classification.  The United States understands that Plaintiffs consider the roads claimed in this litigation to be Class D roads.  The statutory section referenced by section 72-5-302(2) pertaining to class D roads, Utah Code Ann. § 72-3-105, states that the State and county

48

have joint undivided interest in title to all rights-of-way for class D roads.  Utah Code Ann. § 72-3-105(3).  Section 72-5-103(2)(b) provides that if a highway is a county road, or included in a R.S. 2477 right-of-way, title is held jointly by the State and the county.

### 1.    The Utah Legislature's 1993 Statutory Enactments Were Insufficient to Create an Ownership Interest in the State.

Section 72-5-302(2) was originally enacted in 1993 as an amendment to § 27-16-103.  See 1993 Utah Laws 2nd Sess. Ch. 6 (H.B. 6) at § 3.  That original statutory enactment provided that: "The state and its political subdivisions have title to the R.S. 2477 rights-of-ways."  That enactment did not purport to give the State title to R.S. 2477 rights-of-way for county roads or vice versa.  Rather, the statute can most reasonably be read as providing that the State owns rights-of-way for state roads, and its political subdivisions, i.e., the counties, own rights-of-way for county roads.

Moreover, even if the 1993 statute is read as purporting to give the State title to R.S. 2477 rights-of-way for county roads, it still fails to create an ownership interest in the State sufficient to establish justiciable claims in this litigation.  Of critical importance, the legislation could not have created a cause of action by the State for the County's claims that were already time-barred under 28 USC § 2409a(g) as of 1993.  That is, the legislation could not be used to resurrect County claims that had already been barred by the statute of limitations.  These time-barred claims specifically include the County's claims for the East Mexican Mountain Road, the Sid's Leap Road, the Copper Globe Road, and the Seeger's Hole Road.  For the reasons discussed above, the statute of limitations would have run prior to 1993 on the County's claims to these roads by virtue of: (1) the United States' assertion of exclusive jurisdiction and control over the Mexican Mountain Road in connection with the 1975 Wainoco permit application, the omission of the East Mexican Mountain Road from the 1980 MOU, and the inclusion of the East Mexican Mountain Road in the Mexican Mountain WSA designated in 1980; (2) the BLM's construction of approximately the first mile of the Sid's Leap Road as part of the BLM's 1961 East Johnny's Fork Road range improvement project and the inclusion of approximately the eastern-most 2.28 miles of the Sid's Leap Road in the Mexican Mountain WSA in 1980; (3) the assignment to the BLM of maintenance responsibility for

49

the Copper Globe Road in the 1971 and 1980 MOUs and the recording of the easement deed for the portion of the road located over State lands in 1985; and (4) the assignment to the BLM of maintenance responsibility for the Upper Seeger's Hole Road in the 1971 MOU, and the BLM's subsequent grading of the road on an annual or near annual basis starting no later than 1978.

### 2. The Utah Legislature's 2000 Statutory Enactments Were Likewise Insufficient to Create an Ownership Interest in the State.

The first statutory enactments clearly purporting to give the State an ownership interest in rights-of-way for county roads were Sections 72-3-105(3) and 72-5-103(2)(b), which were originally enacted in 2000.  See 2000 Utah Laws Ch. 324 (S.B. 249) at §§ 4, 6.  However, again, these statutory enactments could not have created a cause of action by the State where – as with the East Mexican Mountain, Sid's Leap, Copper Globe, and Seeger's Hole roads – the County's claims were already time-barred before 2000 by 28 USC § 2409a(g).  As discussed in the preceding section, numerous actions resulted in the running of the statute of limitations on the County's claim for these roads before 1993.  In addition, the statute of limitations was again triggered and would have run well before 2000 as to the County's claims for: (1) the Mexican Mountain Road by virtue of the 1984 trespass citation and the subsequent reclamation and closure activities; and (2) the Seeger's Hole Road by virtue of the BLM's continued grading of the Upper Seeger's Hole road on an annual or near annual basis throughout the 1980s.  Accordingly, Plaintiffs' claims to the East Mexican Mountain, Sid's Leap, Copper Globe, and Seeger's Hole roads are barred by Utah's legislative scheme, which did not purport to accord the State an interest in these roads until after the County's claims were time-barred under the QTA's 12 year statute of limitations.[29]  28 U.S.C. § 2409a(g).

---

[29]Prior to this legislation, the State lacked any putative interest in County roads and associated rights-of-way alleged to exist under R.S. 2477.  In fact, the parties to the 1971 and 1980 MOUs proceeded on this apparent understanding, given that the State is not a party to those agreements, and there is no suggestion in the agreements that the parties contemplated the State might claim an ownership interest in the roads addressed by the MOUs.  The State would presumably have been a party to the MOUs, or its interest would have at least been referenced in some way, if the parties had understood that the State asserted any interests that could have been implicated by the agreements' provisions regarding maintenance and, as to the 1980 MOU, the potential existence of R.S. 2477 rights-of-way.

**IV.    The State's Claims as to the East Mexican Mountain Road, Sid's Leap Road, Copper Globe Road, and Seeger's Hole Road Are Barred by Utah Code Ann. § 78B-2-201.**

Utah Code Ann. § 78B-2-201 provides:

> The state may not bring an action against any person for or with respect to any real property, its issues or profits, based upon the state's right or title to the real property, unless: (1) the right or title to the property accrued within seven years before any action or other proceeding is commenced; or (2) the state or those from whom it claims it received all or a portion of the rents and profits from the real property within the immediately preceding seven years.

Utah Code Ann. § 78B-2-201.  While this state statute does not supercede the QTA's statute of limitations applicable to states, see 28 U.S.C. 2409a(k) and (i), it constitutes a separate state law limitation on the authority of the State of Utah to file actions for title to real property.  See Trail Mountain Coal Co. v. Utah Div. of State Lands and Forestry, 921 P.2d 1365, 1372 (Utah 1996) ("A plain reading of the statute reveals that it applies to actions brought by the state as a consequence of the state's claim of right to real property or issues or profits derived from real property").

Under Utah law, in most cases, a cause of action accrues and the statute of limitations begins to run "upon the happening of the last event necessary to complete the cause of action."  Russell Packard Development, Inc. v. Carson, 78 P.3d 616, 620 (Utah App. 2003) (quoting Spears v. Warr, 44 P.3d 742, 75 (Utah 2002)).  "'Mere ignorance of the existence of a cause of action does not prevent the running of the statute of limitations.'"  Warren v. Provo City Corp., 838 P.2d 1125, 1129 (Utah 1992) (citation omitted); see also Christiansen v. Utah-Idaho Sugar Co., 590 P.2d 1251, 1252-53 (Utah 1979) (holding that in a suit for damages for the alleged breach of covenants under a special warranty deed "[t]he time the cause of action accrues . . . is the time at which the grantee first receives notice, either actual or constructive, of an encumbrance against his property").

For the reasons discussed extensively above, the State had notice of the United States' adverse claims to the East Mexican Mountain, Sid's Leap, Copper Globe, and Seeger's Hole roads long before 1993 and certainly more than seven years before this action was filed in 2005.  Therefore, the State's claims to these roads are further precluded by Utah Code Ann. § 78B-2-201, which serves as an additional limit on the State's authority to prosecute this action as to these claims.

51

**CONCLUSION**

For all the foregoing reasons, the Court should enter summary judgment in favor of the United States on Plaintiffs' claim to the West Mexican Mountain Road because there is no case or controversy over this portion of Plaintiffs' claim and no disputed title to real property.  The Court should further enter summary judgment on Plaintiffs' claims to the East Mexican Mountain Road, Sid's Leap Road, Copper Globe Road, and Seeger's Hole Road because these claims are time-barred by virtue of the QTA's 12 year statute of limitations, the limits applicable to the State's purported interest under Utah's legislative scheme, and Utah Code Ann. § 78B-2-201.

RESPECTFULLY SUBMITTED this 21st day of January, 2011.

IGNACIA S. MORENO, Assistant Attorney General
Environment & Natural Resources Division

 /s/ Thomas K. Snodgrass
THOMAS K. SNODGRASS, Trial Attorney

Attorneys for the United States

OF COUNSEL:

James E. Karkut
U.S. Department of the Interior
Office of the Solicitor, Intermountain Region
Salt Lake City, Utah 84138

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 21, 2011, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Roger R. Fairbanks      rfairbanks@utah.gov
Harry H. Souvall        hsouvall@utah.gov


　　　　　　　　　　　　　　　　　　/s/ Susan Middagh

EXHIBIT LIST

Memorandum in Support of United States' Motion for Partial Summary Judgment

(Civil No. 2:05CV00540 DB)

| Exh. No. | Description |
|---|---|
| 1. | Map of claimed Mexican Mountain Road |
| 2. | Excerpts from Plaintiffs' Discovery Responses |
| 3. | Declaration of Michael Dekeyrel |
| 4. | Copy of Utah Dept. of Nat. Res., Div. Of Oil, Gas and Mining, Oil and Gas Well File, API Well 43–15-30040, as on file with BLM |
| 5. | BLM Price Field Office file on Mexican Mountain Road |
| 6. | Case file for individual well record UTU-19175 |
| 7. | 1980 Memorandum of Understanding, with attachments |
| 8. | Excerpts from Deposition of Martha Gail Hahn |
| 9. | BLM Manager, San Rafael Resource Area, Staff Report History of Mexican Mountain Road and Closure |
| 10. | Additional BLM Closure Records for Mexican Mountain Road |
| 11. | Excerpts from BLM Price Field Office Wilderness Case File UT-060-054 |
| 12. | Excerpts from San Rafael Proposed Resource Management Plan and Final Environmental Impact Statement |
| 13. | Record of Decision and excerpts from 1991 San Rafael Final Resource Management Plan |
| 14. | Excerpts from Deposition of Tom Gnojek |
| 15. | Map of claimed Sid's Leap Road |
| 16. | Excerpts from BLM Price Field Office Range Improvement File, East Johnny's Fork Road |
| 17. | Excerpts from Deposition of Ray Petersen |
| 18. | WSA IMP Monitoring Record excerpted from BLM Price Field Office WSA IMP files |
| 19. | Map of claimed Copper Globe Road |
| 20. | Excerpts from 1963 Recreation Inventory |

| Exh. No. | Description |
|---|---|
| 21. | 1971 Memorandum of Understanding |
| 22. | Copy of miscellaneous BLM road maintenance and associated records for Justensen Flat-Kimball Wash Road |
| 23. | BLM Price Field Office Case File UTU-54657 |
| 24. | Map of claimed Seeger's Hole Road |
| 25. | Excerpts from Deposition of Burke Williams |
| 26. | <u>Millard County v. United States</u>, No. 93-C-591J (D. Utah Dec. 4, 1995) (Memorandum Decision) |